(Nos. 66080, 66090 cons.—

JEAN SCHAFFNER, as Guardian of the Estate and Person of Daniel Schaffner, Appellee and Cross-Appellant, v. CHICAGO & NORTH WESTERN TRANSPORTATION COMPANY *et al.*, Cross-Appellees (Chicago & North Western Transportation Company, Appellant).

*Opinion filed June 19, 1989.*

2

4

Lawrence X. Pusateri, Larry R. Eaton and Mary F. Andreoni, of Peterson, Ross, Schloerb & Seidel, and James P. Daley, George H. Brant and Myles L. Tobin, all of Chicago, for appellant and cross-appellee.

Corboy & Demetrio, P.C., of Chicago (Philip H. Cor-

boy, Bruce Robert Pfaff and David A. Novoselsky, of counsel), for appellee and cross-appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Michael K. Murtaugh, Marie A. Monahan and John A. Krivicich, of counsel), for appellee Schwinn Bicycle Company.

Kenneth L. Novander, of Chicago, for *amici curiae* Atchison, Topeka & Santa Fe Railroad Company *et al.*

Kathryn A. Bettasso, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE MILLER delivered the opinion of the court:

Daniel Schaffner was severely injured when the wheel disengaged from the front fork of his bicycle while he was riding over a railroad crossing in Highland Park. Daniel was later declared a disabled person as a result of the injuries he sustained in the accident, and his parents, Jean and Perry Schaffner, were appointed co-guardians of his estate. The Schaffners brought the present action on behalf of their son (plaintiff) in the circuit court of Cook County against the Chicago and North Western Transportation Company (North Western), owner of the railroad crossing where the accident occurred, and the Schwinn Bicycle Company (Schwinn), manufacturer of Daniel's bicycle. A jury returned a verdict in favor of the plaintiff and against North Western, and in favor of Schwinn and against the plaintiff; the jury determined the plaintiff's damages to be in the amount of $8,235,000. Judgment was entered on the verdict. Both North Western and the plaintiff appealed, and the appellate court affirmed the circuit court judgment. (161 Ill. App. 3d 742.) We allowed North Western's and the plaintiff's separate petitions for leave to appeal (cause Nos.

66080, 66090, respectively), and we consolidated the appeals for purposes of argument and disposition.

Around 10 p.m. on September 4, 1976, the plaintiff, who was then 15 years old, and two of his friends, Brian Coxon and James Fiocchi, rode their bicycles to a movie theatre in Highland Park. The movie ended shortly before midnight, and the three boys then left the theatre and rode west on Central Avenue. James was in the lead, followed by the plaintiff and then Brian. As Daniel rode across the North Western railroad crossing, the front wheel of his bicycle disengaged from its fork, and the plaintiff flew over the handlebars, landing about 10 feet west of the railroad crossing; the bicycle landed on top of him. An ambulance was called, and the plaintiff was taken to the Highland Park hospital. There, a neurosurgeon found that the plaintiff had sustained massive injuries to his brain. The plaintiff became comatose shortly after the accident, and he remained in that condition for more than two months. The plaintiff was not released from the hospital care until June 1977.

The plaintiff suffers from a number of permanent, disabling conditions as a result of the accident. These include impaired speech, unstable and abnormal gait, left-sided hemiparesis and spasticity, clawed left hand, blindness in his right eye, and loss of half the field of vision in his left eye. Also, the plaintiff engages in inappropriate, uninhibited behavior. Although the plaintiff is able to provide for certain basic needs, such as dressing and bathing himself, and is capable of performing simple household tasks, he requires supervision in his activities and is therefore unable to live alone. The accident has severely impaired the plaintiff's ability to learn, and he is considered unemployable. At the time of trial the plaintiff was living with his parents. The plaintiff's father died while the cause was pending in the appellate

court, and Mrs. Schaffner is now the plaintiff's sole guardian.

The plaintiff's action against North Western was brought under common law negligence and statutory theories of liability, both of which were based on the allegedly poor condition of the Central Avenue crossing. The plaintiff sought to recover from Schwinn under strict liability in tort, alleging that the design of the bicycle was unreasonably dangerous. Originally, the plaintiff sought both compensatory and punitive damages from each defendant, but during trial the parties entered into a stipulation under which the plaintiff dismissed his claims for punitive damages and North Western and Schwinn agreed to submit to the jury verdict forms that required a judgment against at least one of the two defendants. North Western initially filed a claim against Schwinn for indemnity, but that action was dismissed before trial.

The parties presented extensive evidence regarding the condition of North Western's Central Avenue crossing and the design of the Schwinn bicycle the plaintiff was riding at the time of the accident. The Central Avenue crossing was originally constructed in 1959. It comprised two sets of railroad tracks, and the crossing was at grade; gumwood timbers were used for the crossing surface. In 1971, North Western decided to rebuild the crossing, and the company budgeted $8,870 for that purpose. The work was never performed, however, and the project was eventually cancelled. During 1974 and 1975 officials of Highland Park wrote to North Western to complain about the condition of the crossing, which was said to be rough and hazardous. In March 1977, six months after the accident at issue here, North Western again authorized the replacement of the crossing. At that time, a company document listed the Central Avenue crossing as the top priority among the crossings re-

quiring repair in that division of the North Western rail system. The work was completed in June 1977, the same month that the plaintiff was released from hospital care and returned home.

The plaintiff introduced expert testimony from Joseph Kostur pertaining to the condition of the crossing. Kostur was employed by the Illinois Department of Transportation and had conducted safety-related inspections of railroad crossings in connection with his work. Based on his examination of photographs of the crossing taken shortly after the plaintiff's accident, Kostur stated that there were substantial deviations between the tops of the rails and the gumwood crossing surface. In Kostur's opinion, the roadway and rails were not substantially flush, and the crossing was therefore in violation of a rule of the Illinois Commerce Commission. Kostur's observations were supported by a number of witnesses who had examined the crossing shortly after the occurrence here. Schwinn employees Jay Towmley and Michael Fritz inspected the scene in September 1976. They testified that the gumwood timbers forming the crossing surface were 2 to $3\frac{1}{2}$ inches higher than the rails along the western pair of tracks, where the plaintiff's bicycle wheel had disengaged. The Schwinn employees rode a bicycle over the crossing, and they described it as being quite rough. They noticed that cars passing over the crossing would cause the timbers to bounce up several inches. The plaintiff's friends, Brian Coxon and James Fiocchi, similarly testified that the crossing was rough and uneven.

G. Rex Nichelson, an independent consultant and a professional engineer, testified as an expert witness in behalf of North Western. Viewing photographs of the Central Avenue crossing, Nichelson stated that the rails and crossing surface were substantially flush. Several Highland Park police officers who had driven over the

crossing around the time of Daniel's accident testified that the crossing was not rough. Peter Conenna, the section foreman in charge of the stretch of track that includes the Central Avenue crossing, testified that the crossing had been in good condition throughout the period from 1971 to 1977.

At trial, the parties also introduced evidence concerning the design of the bicycle the plaintiff was riding at the time of the accident, a 1973 Schwinn "Continental" 10-speed. The front hub of the bicycle was equipped with a quick-release mechanism, which is a device that enables the user to remove the wheel from the front fork by turning a lever. According to a stipulation introduced into evidence, in the period from 1968 to 1985, Schwinn received 131 reports of incidents in which wheels disengaged from quick-release axles while moving. In 1977 Schwinn began selling its quick-release models with positive retention devices, which would prevent disengagement of the wheel in the event that the quick-release lever came open.

The plaintiff also presented the expert testimony of Irving Hazard, a mechanical engineer. Hazard stated that the design of Daniel's 1973 Schwinn bicycle was unreasonably dangerous because it did not have a positive retention device on the front axle, which would have prevented the wheel from disengaging as Daniel rode his bicycle over the rough crossing. Hazard believed that several retention devices, including one that Schwinn had developed by 1973, but had decided not to use, would have been effective for that purpose.

Arthur DeLong, an engineer, testified as an expert witness in Schwinn's behalf. DeLong believed that the design of the bicycle was reasonable. In his reconstruction of the accident, DeLong concluded that the plaintiff's bicycle had struck a depression 8½ inches wide and 2 to 3 inches deep in the crossing at a 15- to 20-degree

angle from perpendicular. According to DeLong, the impact caused the plaintiff to pull on his handlebars in the opposite direction. The force of that maneuver removed the clamping force of the quick-release mechanism and permitted the wheel to come free. Schwinn also presented evidence of laboratory tests that demonstrated the reliable performance of quick-release mechanisms like the one used on the plaintiff's bicycle.

Prior to the submission of the case to the jury, the parties agreed that the plaintiff's claim against each defendant for punitive damages would be dismissed, that neither defendant would contend that the plaintiff's conduct at the time of the accident caused or contributed to his injuries, and that the jury would receive verdict forms requiring a finding of liability against at least one of the defendants. The jury returned verdicts in favor of the plaintiff and against North Western, and in favor of Schwinn and against the plaintiff. The jury answered a special interrogatory to the effect that the plaintiff's bicycle was not in an unreasonably dangerous condition at the time of its manufacture and was not a proximate cause of the plaintiff's injuries. Using an itemized verdict form, the jury assessed a total of $8,235,000 in damages against North Western.

North Western and the plaintiff appealed the circuit court judgment. The appellate court affirmed, rejecting those parties' claims of error. (161 Ill. App. 3d 742.) Both North Western and the plaintiff have appealed the appellate court's decision. The plaintiff's appeal is a conditional one, however, for he seeks a new trial on his claim against Schwinn only in the event that North Western must be granted a new trial. North Western raises a number of allegations of error in support of its request for a new trial in this case, and we shall consider those issues in the sequence in which they are presented in the railroad's brief.

## I. Evidence of Subsequent Remedial Measures

North Western first argues that the trial judge erred in permitting the plaintiff to present evidence of the railroad's replacement of the crossing in question less than a year after Daniel's accident occurred. *Amici curiae*, the Illinois Trial Lawyers Association and a number of railroad companies, were granted leave to submit briefs with respect to this issue.

As a general rule, evidence of subsequent remedial measures is not admissible as proof of negligence. (*Grubb v. Illinois Terminal Co.* (1937), 366 Ill. 330, 351; *Hodges v. Percival* (1890), 132 Ill. 53, 56-57; *Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 251-52; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §407.1 (4th ed. 1984).) "The rationale for this long-standing rule is twofold: correction of unsafe conditions should not be deterred by the possibility that such an act will constitute an admission of negligence, and, more fundamentally, a post-occurrence change is insufficiently probative of prior negligence, because later carefulness does not necessarily imply prior neglect. [Citations.]" (*Lundy*, 93 Ill. App. 3d at 252.) Such evidence may be introduced for other purposes, however, and the plaintiff contends that several different grounds warranted its admission in this case.

The plaintiff asserts that the evidence was admissible to establish willful and wanton misconduct on the part of North Western, to demonstrate the feasibility of making repairs to the crossing, to rebut or impeach North Western's testimony regarding the condition of the crossing at the time of the accident, and to demonstrate willful and wanton misconduct on the part of North Western.

In the present case, the appellate court held that the evidence concerning North Western's post-accident replacement of the Central Avenue crossing was properly

admitted, on the plaintiff's claim for punitive damages, as proof of the railroad's willful and wanton misconduct. (161 Ill. App. 3d at 754.) The appellate court relied on *Collins v. Interroyal Corp.* (1984), 126 Ill. App. 3d 244, for that proposition. The court noted that North Western did not move to strike the evidence after the punitive damages claim was dismissed.

We decline to read *Collins* as broadly as the appellate court did in this case. In *Collins*, a products liability action that included a claim for punitive damages, the plaintiff was injured when an adjusting screw fell out of a leg of the stool she was using, causing it to collapse. At trial, the plaintiff was allowed to introduce evidence of two modifications made by the defendant manufacturer to the original design of the stool leg. According to the plaintiff's expert witness, the first modification, denominated "design B," was, like the original design, unreasonably dangerous; the second modification, "design C," was not unreasonably dangerous. Design B went into production before the plaintiff was injured and, indeed, before the plaintiff's employer purchased the stool. Design C went into production after the plaintiff's accident. Other evidence indicated that after the manufacturer adopted design B, the company continued to sell, without modification, its inventory containing the original leg design.

The court in *Collins* held that the evidence concerning design C was admissible to establish the feasibility of an alternative design (126 Ill. App. 3d at 251; see also *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 163) and that the evidence concerning design B was admissible to support the plaintiff's claim for punitive damages. Discussing the testimony relating to design B, the appellate court explained:

> "With regard to [the plaintiff's expert's] testimony that design B was unreasonably dangerous, the trial

court properly admitted it to show wilful and wanton misconduct. \*\*\* While post-occurrence changes are insufficiently probative of a manufacturer's prior neglect, in this case, evidence of design B, including [the expert's] testimony that it was unreasonably dangerous, was probative of a course of conduct engaged in by Interroyal which was wilful and wanton. This design B testimony was relevant to prove that Interroyal, knowing of the specific defects in design A, failed to correct them even though the defect could have been cured easily. It was not until 1977 when Interroyal introduced design C that it produced a product which was not unreasonably dangerous. This evidence tended to show that Interroyal acted with conscious disregard for the safety of others." (126 Ill. App. 3d at 251.)

Thus, the design B evidence was admissible because it demonstrated that the manufacturer was aware of the unreasonably dangerous nature of the original design before the plaintiff's accident occurred. The court in *Collins* went on to note that there was also a question raised at trial whether the plaintiff had been using a design A stool or a design B stool at the time of the accident; the court concluded that the design B evidence "was admissible to show that plaintiff's injuries were caused by an unreasonably defective stool," regardless of which model she had actually used. 126 Ill. App. 3d at 252.

We do not construe *Collins* as purporting to establish a rule that evidence of post-occurrence remedial measures may be introduced as proof of willful and wanton misconduct. We note that the appellate court, in the present appeal, cited two other cases in the course of its discussion of this question, *Stromquist v. Burlington Northern, Inc.* (1983), 112 Ill. App. 3d 37, and *First National Bank v. Illinois Central Gulf R.R. Co.* (1978), 62 Ill. App. 3d 36. *Stromquist* and *First National Bank* upheld awards of punitive damages on the strength of evi-

dence establishing the defendants' pre-accident notice of the allegedly dangerous conditions of their crossings; the two cases did not otherwise speak to the issue here.

We decline to approve the introduction of the evidence of North Western's post-occurrence remedial measures in connection with the plaintiff's claim, which was later withdrawn, seeking punitive damages. The same policy considerations that militate against admission of that evidence as proof of negligence, discussed earlier, counsel against its admission as proof of willful and wanton misconduct. Nor do we believe that the evidence presented here of the subsequent replacement of the Central Avenue railroad crossing may be justified on either of the other grounds suggested by the plaintiff. North Western did not dispute that replacement of the crossing was feasible. (*Cf. Dallas v. Granite City Steel Co.* (1965), 64 Ill. App. 2d 409, 423-24 (evidence of post-accident remedial measure admissible where defendant contested financial feasibility of remedy).) And it cannot be said that the evidence served to rebut North Western's testimony regarding the condition of the crossing, for the railroad did not contend that the crossing never required maintenance.

We believe, however, that any error in the introduction of the evidence was harmless. (See *Hodges*, 132 Ill. at 57-59 (error in admission of post-accident remedial measure not prejudicial).) The jury in this case received testimony from a variety of witnesses establishing that the crossing was in need of repair at the time of Daniel's accident. The jurors learned that North Western had originally authorized replacement of the crossing in 1971 but that the railroad had later cancelled the project. The jurors also learned of the actions of Highland Park officials, who had complained to North Western about the condition of the crossing. Finally, a number of witnesses testified to the deteriorated condition of the crossing in

September 1976, when the accident occurred. In view of the substantial amount of competent evidence regarding the condition of the crossing that was introduced during the course of this lengthy trial, we do not consider that North Western was prejudiced by the testimony concerning its eventual replacement of the crossing. We note, too, that the plan for replacement of the crossing did not come immediately after the accident but rather was formulated some six months later; the jurors may have considered that North Western believed that passage of time had caused deterioration sufficient to warrant the crossing's repair.

## II. Rulings on Motions *in Limine*

In the present appeal North Western also contests a number of rulings made by the trial judge on motions *in limine* filed by the parties in this case.

### A. Photographs

North Western argues that the trial judge erred in excluding certain photographs of the accident scene that it offered into evidence. Unlike the photographs offered and introduced into evidence by the plaintiff and by Schwinn, which generally depicted the railroad tracks in a north-south direction, North Western's photographs showed the crossing from an east-west perspective, perpendicular to the tracks. North Western maintains that the other parties' photographs improperly accentuated the appearance of the flangeways, or the gaps running between the rails and surrounding timbers, and that its own photographs more accurately depicted the condition of the crossing.

The decision whether to admit or exclude photographic evidence or exhibits is reserved to the discretion of the trial judge. (*Lindsay v. Appleby* (1980), 91 Ill. App. 3d 705, 710-11; *Kyowski v. Burns* (1979), 70 Ill.

App. 3d 1009, 1016-17; see *People v. Evans* (1988), 125 Ill. 2d 50, 96-97 (photographs of fetus of pregnant murder victim); *People v. Fierer* (1988), 124 Ill. 2d 176, 193 (pre-autopsy photographs of murder victim showing wounds).) We cannot say that the trial judge abused his discretion in excluding North Western's photographs. Central Avenue, where it crosses the North Western tracks, was a one-way street, and at the time of the accident Daniel and his friends were riding in the wrong direction. Before trial, the court granted the plaintiff's motion *in limine* to preclude evidence and argument that Daniel was riding his bicycle in the wrong direction on a one-way street. The photographs submitted by North Western showed a number of street signs that clearly indicated the proper flow of traffic in the area of the crossing, and the trial judge was correct in excluding the photographs on that ground. We note, too, that plaintiff's counsel suggested that the photographs be cropped to obviate their potential prejudice, but North Western did not choose to do so in the suggested manner.

## B. Tampering

North Western next argues that the circuit judge erred in granting the plaintiff's motions *in limine* to exclude certain evidence and argument on the possibility that someone might have tampered with the quick-release mechanism on Daniel's bicycle before the accident occurred.

The evidence in question consisted of several statements made by Coxon and Fiocchi in their depositions regarding the possibility that someone might have tampered with the quick-release mechanism on Daniel's bicycle. The plaintiff also moved to preclude the defendants from eliciting such evidence from the expert witnesses in the case. The trial judge granted the motions. North

Western now contends that the rulings were erroneous and denied the railroad the opportunity to challenge the plaintiff's theory of causation.

Contrary to North Western's view, there was no competent evidence of tampering in this case. (*Cf. Tomasovic v. American Honda Motor Co.* (1988), 171 Ill. App. 3d 979, 989-90 (trial court properly admitted expert witness's testimony that latch hook on motorcycle gas cap had been fractured by tampering before accident occurred).) What the plaintiff sought to exclude was merely speculation that the mechanism might have been tampered with. We would observe, too, that despite the trial court's rulings on the motions *in limine*, much of the same information was in fact presented to the jury.

Nor do we agree with North Western that the record contained circumstantial evidence of tampering and that the trial judge therefore erred in precluding argument on the issue. In support of this argument, North Western points to the evidence that Daniel and his friends had traversed the same crossing a great number of times without incident, that the boys' bicycles were left unattended at the movie theatre before the accident for a period of nearly two hours, at night, that Coxon and Fiocchi said that the release was open after the accident, and that expert witnesses Hazard and DeLong said that the lever might have been open. North Western also contends that Daniel's trial testimony that he checked the condition of the front wheel and hub before he left the theatre may be doubted, in light of the evidence suggesting that he lacks a reliable memory of the accident. North Western contends that the trial testimony was sufficient to have raised a jury question whether the quick-release mechanism was tampered with before Daniel's accident.

Even if the trial judge's original ruling barring the introduction of evidence of tampering was erroneous, we

cannot say that the court's order prohibiting argument on that issue was prejudicial to North Western. In light of the parties' agreement that the plaintiff would prevail against at least one of the two defendants, such evidence and argument became irrelevant. In this case, evidence that the quick-release mechanism on Daniel's bicycle might have been tampered with before the accident could have been relevant in two distinct respects: to show that the loosening of the lever by a third party was the proximate cause of the accident, or to show that the design of the quick-release mechanism made it susceptible to tampering. Neither question was at issue here, however. The possibility that a third party caused the accident was removed from the case by the parties' stipulation regarding the verdict forms in the case. Nor would that evidence have been relevant in the plaintiff's action against Schwinn, for there was no allegation by the plaintiff that the design of the mechanism made it susceptible to tampering.

## C. Absent Witnesses

North Western also contends that the trial judge erred in allowing codefendant Schwinn to offer evidence and argument concerning the railroad's failure to call two previously identified witnesses to testify at trial in this case. In its answers to interrogatories propounded by the plaintiff, North Western had identified John McClellan as a person having knowledge of the condition of the crossing after the plaintiff's accident, and John Forester as an expert witness on the subjects of bicycle construction and maintenance, and accident reconstruction. North Western did not call either man to testify in this case.

The trial judge denied Schwinn's motion to present as evidence certain portions of Forester's deposition. But the court did permit Schwinn, over North Western's ob-

jection, to read to the jurors the railroad's interrogatory answers identifying the two men, and, in argument, counsel commented adversely on the witnesses' absence. Schwinn did not, however, tender an instruction on the inference that may drawn from a party's failure to produce a witness within its control (see Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971) (IPI Civil 2d)), and no instruction on that subject was given. North Western contends here that the trial judge erred in permitting Schwinn to identify the two witnesses to the jurors and to comment on their absence.

As a general matter, the adverse inference is available when the missing witness was under the control of the party to be charged and could have been produced by reasonable diligence, the witness was not equally available to the party requesting that the inference be made, a reasonably prudent person would have produced the witness if the party believed that the testimony would be favorable, and no reasonable excuse for the failure to produce the witness is shown. (*Hollembaek v. Dominick's Finer Foods, Inc.* (1985), 137 Ill. App. 3d 773, 776; IPI Civil 2d, No. 5.01; see *Wetherell v. Matson* (1977), 52 Ill. App. 3d 314, 318-19 (same criteria govern use of pattern instruction and allowance of adverse comment in argument).) The decision whether to use the instruction or permit the argument is reserved to the sound discretion of the court (see *Tonarelli v. Gibbons* (1984), 121 Ill. App. 3d 1042, 1046-47 (instruction)), and we do not believe that the trial judge abused his discretion in permitting Schwinn's counsel to comment adversely on the two witnesses' absence.

North Western retained Forester as one of its two expert witnesses in this case. In answer to the plaintiff's interrogatories, North Western explained that the witnesses would testify on different subjects; the railroad's answer stated, "Defendant intends to call Rex Nickelson

[*sic*] as a crossing expert and Mr. John Forester as its expert on bicycle construction and maintenance as well as on the subject of accident reconstruction." Forester had been hired by North Western, and, because he lived in another State, he could not be subpoenaed to testify by the other parties. It was proper for the court to conclude that Forester was under North Western's control and was not available to the opposing parties. (See *Ciborowski v. Philip Dressler & Associates* (1983), 110 Ill. App. 3d 981, 985-86.) In light of North Western's identification of Forester as an authority on subjects not within the expertise of its other expert witness, it was also reasonable for the court to conclude that Forester would have been called to testify in this case if North Western had believed that he would offer favorable testimony. Nor do we believe that the railroad offered a reasonable excuse for its failure to call the witness. Contrary to North Western's claim, we do not consider that his testimony would have been merely cumulative. Under the circumstances present in this case, it was not an abuse of discretion for the trial judge to permit Schwinn to read North Western's answer to interrogatories, which identified Forester as one of its anticipated witnesses (*cf. Cicale v. Aronson* (1969), 113 Ill. App. 2d 324, 333 (interrogatory answer improperly read because witness not under party's control)), and to comment on the witness' absence.

Nor did the trial judge abuse his discretion in allowing Schwinn to comment adversely on North Western's failure to call its employee, McClellan, as a witness. North Western sent McClellan to inspect the crossing scene shortly after the plaintiff's accident; McClellan was accompanied by a photographer, who took North Western's accident-scene photographs. We consider that McClellan, as North Western's employee, was within the railroad's control. (See *Donnelly v. Washington National*

*Insurance Co.* (1985), 136 Ill. App. 3d 78, 88; *Kerns v. Lenox Machine Co.* (1979), 74 Ill. App. 3d 194, 198-99.) Moreover, it may be assumed that North Western would have presented the witness if it had believed that his testimony would be favorable. North Western contends, however, that it offered a reasonable excuse for not introducing the witness' testimony. During trial, after North Western's photographs of the crossing were barred from evidence because they depicted Central Avenue as a one-way street, the trial judge said that he would permit Schwinn's counsel, in cross-examining McClellan, to refer to the taking of the excluded photographs. North Western argues that its reason for not presenting the witness was a reasonable one, in light of the trial judge's indication that he would permit the proposed cross-examination. We do not believe that North Western can now claim prejudice in this regard. North Western's predicament was largely of its own making, for the railroad had declined opposing counsel's suggestion that the photographs could be cropped in a simple manner, which would have permitted their admission. Under the circumstances here, it was not an abuse of discretion for the trial judge to allow comment to be made on North Western's failure to call the investigator as a witness.

### D. Argument on Damages

North Western next contends that the trial judge improperly limited the scope of closing argument by granting the plaintiff's motion *in limine* to prevent the railroad's counsel from arguing that any sum of damages awarded to the plaintiff could be invested to produce a stream of income.

It is clear that such argument would have been error and that the trial judge was correct in prohibiting the argument. Under Illinois law, future damages for medical

expenses and lost earnings are to be discounted to present cash value, but damages for pain and suffering, disability, and disfigurement are not to be discounted to present cash value. (See IPI Civil 2d, No. 34.02, Comment, at 192 (citing *Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill. 2d 164; *Avance v. Thompson* (1944), 387 Ill. 77; *Howard v. Gulf, Mobile & Ohio R.R. Co.* (1957), 13 Ill. App. 2d 482).) The jury instructions that were used in this case reflected that rule. (See IPI Civil 2d Nos. 30.01, 30.04, 30.05, 30.06, 30.07, 34.04.) Under the instructions, a sum of future damages is reduced to present cash value by taking into account the investment income that may be generated on a present award of compensation. Here, the plaintiff sought to preclude any argument that would have suggested to the jury that they should consider, in determining damages, any income that could be obtained by investment of the sums of future damages computed by the plaintiff's expert, Professor Linke. In this case, North Western's argument would only have had the effect of inviting the jury to make either an additional reduction in sums already reduced to present cash value by Professor Linke, or an improper reduction in sums that should not be reduced to present cash value, such as damages for pain and suffering.

North Western contends, however, that the record in this case contained evidence supporting the suggested argument. North Western relies on certain statements by the plaintiff's economist, Professor Linke, regarding the amount of money that could be earned at then-current interest rates on the sums he had calculated for future lost earnings and future medical expenses. In citing that testimony, however, North Western ignores the witness' explanation that he had already reduced the sums to present cash value and that further consideration of the income that could be earned on investment of those

amounts would be unwarranted, representing an additional reduction to present cash value.

### III. In-Court Evidentiary Demonstration

North Western next complains of error occurring in the course of the testimony of Schwinn's expert witness, Arthur DeLong. During DeLong's testimony, counsel for Schwinn suggested that a juror be allowed to hold the front wheel assembly to feel the gyroscopic force produced by the spinning wheel. One of the jurors volunteered and, over objection, was permitted to take part in the suggested demonstration. North Western contends that the involvement of the juror in the experiment with Schwinn's witness was prejudicial, and that the participating juror in effect became a witness for Schwinn, and one who was shielded from cross-examination. We note that the plaintiff, in his separate, conditional appeal against Schwinn, makes the same assignment of error.

The demonstration in question took place toward the end of the trial, during Schwinn's presentation of its case in chief. What follows is a description of the event, as recorded in the trial transcript:

"A. [MR. DeLONG] Can I spin test?

Q. [MR. MURTAUGH, SCHWINN'S COUNSEL] What is the spin test?

A. You can try this. You can see it and I can demonstrate it, but in a bicycle or any wheel, when it is out of spinning.

That's what helps hold the bicycle. If you're—it's like a gyroscope. If I should deflect that wheel to the left, see what happens? I hold it. There, see. I didn't pull it over like that. The gyroscopic pulled it over.

All I'm doing is—if you'd like to try it.

MR. MURTAUGH: Your Honor, if any member of the jury would like to try it. It's difficult to see. We can simply—

THE COURT: Is there any objection?

MR. CORBOY: I don't think the jurors—we're put on

the spot now. If we object, we're bad guys.

THE COURT: I think I have to ask if there's an objection.

MR. CORBOY: I have no objection.

MR. BRANT: Well, I will bite the bullet. I object. This is not even touching the ground. I don't know how this is going to show anything, spinning a wheel freely in the air.

THE COURT: Mr. Murtaugh, is it your intention by this demonstration to demonstrate the gyroscopic action solely? Is that what you're doing?

MR. MURTAUGH: That's all, yes, your Honor.

THE COURT: I'll allow it.

MR. MURTAUGH: Thank you.

THE COURT: There's been testimony relative to gyroscopic action and/or a gyroscopic effect.

This demonstration apparently is to illustrate that term, that concept only.

I will allow it.

MR. MURTAUGH: Thank you, your Honor. Any volunteers?

JUROR: I'll try.

THE WITNESS: Hold it down here as close to there as possible.

You see, and I'll spin the wheels at the angle. Then after the wheel is spinning just turn your hand like that, you see, which would be the effect of the wheel suddenly being thrust to the left.

BY MR. MURTAUGH:

Q. What will be the effect of when he does it?

A. It should throw it over to this direction to the right.

Q. Sudden movement of his hand to the left?

JUROR: It does throw it off.

THE WITNESS: No. You have to do it quickly, you see.

MR. MURTAUGH: Okay.

JUROR: There is a force.

THE WITNESS: See.

BY MR. MURTAUGH:

Q. Now, what effect does that gyroscopic action have on the operation of the bicycle?

Obviously, Mr. Brant pointed out the bicycle that Mr Schaffner was riding at the time of the accident was on a certain surface.

What effect does it have on the bicycle itself with the wheel on the ground?

A. With the wheel on the ground, since the force is a rotational force, it tends to throw the bicycle over to the right."

Present in the record in this case is an "appendix" to the portion of the transcript quoted above. Apparently prepared by one of the trial attorneys, the document provides a further description of the demonstration. The appendix states:

"After the Court ruled, a male juror, who was one of the original 12 jurors, and not an alternate, left the jury box and was handed Schwinn Exhibit No. 56 by Mr. De-Long. Exhibit 56 consisted of the front wheel assembly of a bicycle and included a front wheel, fork and handle bars.

Standing between Mr. DeLong and Mr. Murtaugh, the juror held the front wheel assembly by the fork stem off the floor and approximately perpendicular to the floor. Then, Mr. DeLong spun the wheel and the juror twisted the fork stem to the left while the wheel was spinning, and the spinning wheel tilted in a counter-clockwise direction from the original perpendicular position.

As shown by the Report of Proceedings there were statements made during this demonstration by Mr. DeLong, Mr. Murtaugh and the juror as to the progress of the demonstration.

After of [sic] the demonstration, which took approximately two minutes, the juror returned to the jury box."

In the present appeal North Western contends that the involvement of the juror in the demonstration was error. North Western maintains that the participating juror gained knowledge that was unavailable to the other

jurors and became, in effect, a witness for Schwinn, placed beyond the reach of cross-examination by opposing counsel. North Western asserts that the demonstration was calculated to ingratiate Schwinn's expert and attorney with the jury and that it unfairly promoted Schwinn's theory of the case.

As the transcript indicates, plaintiff's counsel did not object to the suggested procedure. But, contrary to the appellate court's statement in its opinion, counsel for North Western did make a contemporaneous objection, saying, "Well, I will bite the bullet. I object. This is not even touching the ground. I don't know how this is going to show anything, spinning a wheel freely in the air." Although it is not clear from the record whether North Western was making only a specific objection to the demonstration, based on the dissimilarity between the in-court test and Daniel's bicycle, or whether the railroad was making both specific and general objections, the trial judge should have barred the demonstration on his own motion. Involving jurors in the demonstration or presentation of evidence is, we believe, an unsound practice. There are several potential dangers in enlisting jurors in such undertakings. Personal exchanges and other forms of intercourse between jurors and either counsel or witnesses may tend to cast the participants in a favorable or unfavorable light in the eyes of the jury. (See *Campbell v. Fox* (1986), 113 Ill. 2d 354, 357-59 (new trial ordered where defendant physician in medical malpractice action had come to assistance of stricken juror during opening statements); *People v. Davis* (1970), 46 Ill. 2d 554, 560 (disapproving prosecutor's tactic of addressing jurors individually by name in closing argument).) Similarly, courts have condemned efforts to involve jurors in the demonstration of physical impairments. (See *Vance v. Monroe Drug Co.* (1909), 149 Ill. App. 499 (error for jurors to have manipulated plaintiff's injured

hand to determine its mobility); *Stewart v. Weiner* (1922), 108 Neb. 49, 187 N.W. 121 (error for jurors to have shaken weakened hand of personal injury plaintiff; participating juror beyond reach of cross-examination); *Gray v. L-M Chevrolet Co.* (Texas Civ. App. 1963), 368 S.W.2d 861 (affirming trial judge's order sustaining objection to personal injury plaintiff's counsel's invitation to juror to feel "sunken place" on plaintiff's back; juror would have gained information unavailable to fellow jurors and could have drawn own unskilled conclusion from evidence).) The use of jurors as assistants or subjects in evidentiary demonstrations of evidence at trial may have the effect of converting the participant into a witness for the party conducting the test. The juror may acquire knowledge that is not directly available to the other jurors, and opposing counsel is unable to cross-examine him on his experience. These concerns militate against the involvement of jurors in evidentiary demonstrations.

Despite the hazards that may arise from attempts to involve jurors in the presentation of evidence, we do not believe that the error that occurred here was prejudicial. Several circumstances weigh in favor of that conclusion. First, the experiment used by Schwinn's expert was a simple one, and it cannot be said that the juror who took part in the test acquired arcane knowledge that was outside everyday experience. Also, we note that the test illustrated only a portion of the basis for the expert's opinion, and successful completion of the demonstration was therefore less likely to convert the participating juror into an advocate for Schwinn's theory. Moreover, as the appendix indicates, the demonstration was brief, lasting only about two minutes. Finally, the device used in the demonstration was, like the other exhibits admitted at trial, sent to the jury room at the close of evidence in this case, without objection, and it was there-

fore available to the jury during its deliberations. Those jurors who were so disposed were thus free to duplicate for themselves in the jury room the same brief test that had been conducted in the courtroom; there is no argument raised here that such experimentation by the jurors would have been inappropriate. It is clear, then, that the juror who took part in the demonstration did not gain information that remained unavailable to the other jurors. Although we believe that the better course would have been for the trial judge to prohibit Schwinn's counsel from attempting to involve the jury in the company's presentation of its evidence, we conclude that any error occurring in the demonstration was harmless.

## IV. Other Allegations of Error

North Western also alleges a number of other errors occurring at the trial of this case that, it believes, singly or cumulatively warrant the granting of a new trial. We shall consider each of these contentions in turn.

### A. Trial Judge's Explanation of Standard of Proof

North Western argues that the trial judge improperly advised the jurors on the standard of proof applicable in civil actions in Illinois. Illustrating the difference in proof required in civil and criminal proceedings, the judge explained that the plaintiff in a civil action will prevail if his evidence is "ever so slightly" stronger than that of the defendant. North Western argues that the trial judge's statement was a violation of the stricture in our Rule 234 prohibiting questions during *voir dire* that "directly or indirectly concern matters of law or instructions." 107 Ill. 2d. R. 234.

The remarks complained of occurred during the *voir dire* of the first panel of prospective jurors. Responding to a question from the court regarding previous jury experience, a venireman said that he had once been sum-

moned for jury duty at one of the criminal facilities in Cook County but had not sat on a jury during the prior service. The trial judge took that opportunity to explain the difference in the standards of proof governing civil and criminal proceedings. The judge stated:

"Okay. I'm glad you brought that up. I'm glad you brought that up about 26th and California, because I was meaning to explain the measure of proof or the burden of proof, because we're going to be talking about that; and I'm glad you brought that up.

Now, 26th and California is one of our facilities in the Circuit Court of Cook County which devotes itself to the trial of criminal cases. Okay. In criminal cases, I could tell you, that the measure of proof is, quote, 'beyond a reasonable doubt,' unquote.

That is not the measure of proof in this case. I want you to put the concept of beyond a reasonable doubt out of your mind. It has no place in this courtroom. This is a civil courtroom. The measure of proof in this courtroom is by, quote, 'preponderance of the evidence,' end quote.

Now, there'[ve] been many definitions of preponderance of the evidence. It means that a proposition, if it's more probably true than not, can be proved by a preponderance of the evidence. I'd like to give you an image. I use it because it's the best image I have ever thought of and I'm going to give it to you.

Now, each of you, I think, can recall seeing the statue of justice or the image of the lady of justice. That lady who is *** blindfolded, who holds the scales of justice; and if you will recall, those scales are absolutely equal as she holds them. That's the way we are now. Both sides absolutely equal. Okay.

Preponderance of the evidence means that the plaintiff, the person who has the duty or burden of proof, must tilt that scale in favor of his clients, his clients; that is Daniel Schaffner's mother and father as co-guardians of the disabled person, Daniel Schaffner.

If at the conclusion of the evidence the scales remain equal, the plaintiff loses. If the scales tilt in favor of the

defendants, of course, the plaintiff loses. However, if the scales tilt in favor of the plaintiff ever so slightly, then the plaintiff wins. Clear?"

The panel of veniremen responded affirmatively to the court's question. The trial judge referred to his explanation on several later occasions while reminding the prospective jurors of the difference between civil and criminal standards of proof. At the next recess in the proceedings, counsel for North Western objected to the trial judge's statement regarding the plaintiff's burden of proof and moved for dismissal of the entire venire. The trial judge denied the motion. It appears that all the veniremen who were selected to serve as jurors in the case heard the judge's explanation, and we shall assume, for purposes of review here, that that is what happened.

North Western argues that the court's statement to the venire, "However, if the scales tilt in favor of the plaintiff ever so slightly, then the plaintiff wins," was a misleading description of the standard of proof in civil cases. North Western believes that the trial judge's reference to the slight tilting of the scales of evidence could only have served to minimize, in the minds of the jurors, the plaintiff's evidentiary burden.

North Western correctly observes that this court has previously found error in the use of instructions advising the jury to find for the plaintiff if the evidence preponderates "although but slightly" in his favor. (See *Wolczek v. Public Service Co.* (1930), 342 Ill. 482, 495; *Molloy v. Chicago Rapid Transit Co.* (1929), 335 Ill. 164, 172; *Teter v. Spooner* (1922), 305 Ill. 198, 210-11.) North Western ignores, however, the trial judge's statement to the prospective jurors regarding the proper verdict if the evidence was evenly balanced. The judge explained, "If at the conclusion of the evidence the scales remain equal, the plaintiff loses." When used as a jury instruction, the "evenly balanced evidence" description has been disap-

proved as favoring the defense. (*Goertz v. Chicago & North Western Ry. Co.* (1958), 19 Ill. App. 2d 261, 271.) Both types of instructions have been criticized not because they are inaccurate or untrue, but because they are argumentative and slanted. (See IPI Civil 2d No. 21.06, Comment, at 124-25.) Because the trial judge in the present case, in explaining to the prospective jurors the distinction between civil and criminal standards of proof, gave both an account that has been disapproved as favoring plaintiffs, and an account that has been disapproved as favoring defendants, we do not believe that the jurors would have construed the judge's remarks in a manner prejudicial to the defense in this case.

Moreover, the jury was correctly instructed on the plaintiff's burden of proof, for it received an instruction in the form of IPI Civil 2d No. 21.01, on the meaning of burden of proof. At the conclusion of the evidence the trial judge instructed the jury, "When I say that the plaintiffs have the burden of proof on any proposition or use the expression, quote, 'if you find,' end quote, or, quote 'if you decide,' end quote, I mean you must be persuaded, considering all the evidence in the case, that the proposition on which the plaintiffs have the burden of proof is more probably true than not." Thus, unlike the juries in *Wolczek, Molloy,* and *Teter,* the jury in the present case began its deliberations only after having been correctly instructed on the plaintiff's burden of proof.

Finally, we note that by agreement of the parties the verdict forms that were used in this case required that at least one of the defendants be found liable for the accident. Because North Western and Schwinn would have been equally disadvantaged by whatever error was produced by the trial judge's statements, we do not believe that North Western can now claim that it alone suffered

prejudice in this regard. For these reasons, we conclude that any error in the trial judge's remarks was harmless.

North Western makes the related argument that the trial judge's statements concerning the differences in proof required in criminal and civil proceedings was inconsistent with our Rule 234, concerning the *voir dire* examination of prospective jurors. Rule 234 provides, "Questions shall not directly or indirectly concern matters of law or instructions." (107 Ill. 2d R. 234.) North Western asserts that the trial judge's statements to the jurors regarding the differing standards of proof violated that provision. We do not interpret Rule 234 as narrowly as North Western does. The rule also provides, "The court may acquaint prospective jurors with the general duties and responsibilities of jurors." (107 Ill. 2d R. 234.) The trial judge's comments to the venire were intended to serve that purpose. As we have already indicated, any error arising from those comments was not prejudicial to North Western.

## B. *Testimony of Expert Witness*

North Western next raises several arguments with respect to the testimony of Joseph Kostur, who testified as an expert in the plaintiff's behalf regarding the condition of the Central Avenue crossing. North Western first argues that the trial judge erred in permitting the plaintiff to present Kostur as an expert witness on railroad matters; North Western contends that Kostur did not have adequate training in that field to warrant the admission of his testimony as an authority on the subject. North Western also argues that Kostur's opinion on the condition of the railroad crossing was based on conjecture. Finally, North Western asserts that the trial judge improperly limited its cross-examination of the witness by refusing to permit any inquiry into the frequency of Kostur's testimony on behalf of plaintiffs in various cases.

The general principles governing the admission of expert testimony are well established. An expert witness is "a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation ***." (107 Ill. 2d R. 220(a)(1).) The proponent of the testimony bears the burden of establishing the qualifications of a person to testify as an expert witness on a particular subject (*People v. Park* (1978), 72 Ill. 2d 203, 209), and that determination is a matter generally reserved to the sound discretion of the trial judge (*Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 250).

The trial judge did not abuse his discretion in denying North Western's objection to Kostur's qualifications. The record shows that Kostur left college in 1952 to enter the army. He was sent first to engineering school and later to Korea, where he served as a sergeant in an engineering battalion assigned to the construction of an air base. This involved, in part, the installation of rail lines to the base. After the war Kostur returned to this country, where he worked as a machinist. In 1958 Kostur became employed by the predecessor agency of the Illinois Department of Transportation, and until 1967 he worked in various positions in the agency supervising highway improvement contracts. In 1967 Kostur was selected to be the traffic control coordinator in one of the department's nine districts. In 1969 Kostur was given additional duties involving fleet safety and employee safety and the handling of liability claims against the department. The work often required him to conduct on-site safety inspections of railroad crossings. Kostur estimated that, in his work with the department and as a private consultant, he has inspected "well over 50" railroad crossings.

No less than formal academic training, practical experience in a field may serve to qualify a witness as an expert on a particular subject. (See *Duffy v. Midlothian Country Club* (1985), 135 Ill. App. 3d 429, 437; *Johnson v. Commonwealth Edison Co.* (1985), 133 Ill. App. 3d 472, 482-83.) And in Illinois, a contractor or builder may give an expert opinion on matters relating to construction. (See *Ryan v. E.A.I. Construction Corp.* (1987), 158 Ill. App. 3d 449, 461.) In view of Kostur's experience, we do not believe that the trial judge abused his discretion in permitting the witness to testify as an expert.

North Western makes the related argument that the witness was improperly allowed to provide an opinion concerning the crossing in question here. In his testimony, Kostur said that there appeared to be substantial deviations between the rails and the adjoining timbers, and that the materials were not substantially flush, as required by the rules of the Illinois Commerce Commission. North Western now argues that the witness' opinion was based on conjecture, observing that the witness had never visited the Central Avenue crossing. This testimony was given without objection, and, in fact, North Western elicited some of the now-challenged material during its cross-examination of the witness. We do not agree with North Western that the company's earlier objection to the witness' qualifications as an expert on railroad crossings was sufficient to preserve for purposes of review a challenge to the evidentiary basis for the witness' testimony.

In its final challenge to Kostur's testimony, North Western argues that the trial judge erroneously limited its cross-examination of the witness. During cross-examination Kostur testified, without objection, that plaintiff's counsel had hired him as an expert witness in two previous cases and had subpoenaed him to testify in one case; Kostur described the subjects on which he had

been qualified as an expert on those occasions. The plaintiff objected, however, to any inquiry regarding the witness' testimony in cases involving other attorneys, and the trial judge sustained the objection. The trial judge also said that he would not allow an inquiry into the other areas of claimed expertise unless counsel could offer evidence challenging the witness' qualifications in those subjects. The trial judge believed that it would be unfair to present only the information that the witness had previously testified as an expert in "12 other fields," without also demonstrating his lack of expertise in those fields. North Western argues that the trial court's restriction on the inquiry was incorrect, in light of our recent opinion in *Trower v. Jones* (1988), 121 Ill. 2d 211.

In *Trower*, a medical malpractice action, we approved inquiries by the defense regarding the number of times the plaintiff's expert witness had previously testified in behalf of plaintiffs in medical malpractice actions and the amount of compensation the witness had received in the past for such work, and we ruled that the trial judge had not abused his discretion in permitting defense counsel to ask those questions. (*Trower*, 121 Ill. 2d at 222.) We agree with North Western that, in this case, the trial judge's restriction on the railroad's cross-examination of the witness was, as a general matter, inconsistent with *Trower*. We must note, however, that North Western did not make an offer of proof on the issue, and we are therefore unable to determine whether the limitation on cross-examination constituted an abuse of discretion.

## C. Evidence of Schwinn's Sales

North Western's final objection to the trial proceedings pertains to Schwinn's introduction of evidence of the number of bicycles the company had sold with quick-release axles but without positive retention devices. The

plaintiff was allowed, over Schwinn's objection, to present evidence of the number of accidents that had been reported to Schwinn involving the loss of front wheels on bicycles equipped with quick-release mechanisms. As stipulated by the parties, 131 such accidents were reported to Schwinn between 1968 and 1985. During its case in chief, Schwinn was permitted to introduce, over objection, an exhibit detailing in tabular form the company's annual sales of bicycles that were equipped with quick-release mechanisms but that lacked positive retention devices. The period surveyed in the table was from 1960 through 1975. Schwinn's exhibit also stated the number of complaints the company received each year regarding wheel disengagement on quick-release bicycles. The exhibit provided cumulative totals of the number of complaints received and the number of similarly equipped bicycles sold, through each year shown, and expressed the former as a percentage of the latter. According to the exhibit, in 1975 Schwinn sold 121,184 quick-release equipped bicycles and received 21 complaints of wheel separations. From 1960 through 1975, Schwinn had sold 1,198,501 such bicycles and had received 66 reports of disengaged wheels, which meant that 0.0055% of those sales had resulted in complaints of that nature. North Western argues that the evidence of Schwinn's sales was improperly admitted. We note that the plaintiff, in his separate appeal, makes the same challenge to the evidence of the bicycle manufacturer's sales.

In the present case, the plaintiff introduced the evidence of prior accidents not to show notice, but rather to show that the bicycle was unreasonably dangerous. (*Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 114-15; *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 440-41.) Schwinn argues here that its evidence of prior sales involving quick-release-equipped bi-

cycles lacking positive retention devices was admissible. The appellate court agreed with Schwinn, stating, "It would have been totally inconsistent to permit plaintiffs to introduce evidence of similar prior accidents and then prohibit Schwinn from introducing rebuttal evidence of the number of similar bicycles sold and the absence of reported problems with the quick release mechanism." 161 Ill. App. 3d at 761.

Evidence of the absence of prior accidents involving the same or similar product has been admitted in strict liability actions in Illinois (see *Salvi v. Montgomery Ward & Co.* (1986), 140 Ill. App. 3d 896; *Leischner v. Deere & Co.* (1984), 127 Ill. App. 3d 175, 177; *Darrough v. White Motor Co.* (1979), 74 Ill. App. 3d 560), and we believe that Schwinn's evidence was properly admitted here. We recognize that in *Salvi*, *Leischner*, and *Darrough*, the evidence introduced by the defendants showed a complete absence of prior accidents. We do not believe that the distinction is significant under the circumstances here. As we have indicated, the plaintiff in the present action introduced the evidence of prior accidents to support his argument that the bicycle's design was unreasonably dangerous. That purpose, however, invited the sort of mathematical comparison that Schwinn presented to rebut the plaintiff's proof.

North Western also suggests that there was an inadequate foundation for Schwinn's evidence regarding its prior sales. Parties wishing to present evidence either of prior accidents or of the absence of prior accidents must show a similarity of circumstance between the prior use and the occurrence that caused the injury complained of. (*Rucker*, 77 Ill. 2d at 441; *Leischner*, 127 Ill. App. 3d at 177.) We believe that the foundational requirement was satisfied here, with respect to both Schwinn's proof of the absence of prior accidents and the plaintiff's proof of prior accidents. In each instance the evidence involved

bicycles that, like Daniel's, had quick-release mechanisms but were not equipped with positive retention devices. Moreover, the accident in the present case occurred as the plaintiff was using his bicycle in a foreseeable manner, riding over a railroad crossing. It can be assumed that the bicycles involved in the parties' evidence regarding other occurrences, or the absence of other occurrences, were used in a sufficiently similar fashion. See *Salvi*, 140 Ill. App. 3d at 905 (sufficiency of foundation for introduction of evidence that company had sold 459,000 similar air guns and had not received any prior reports of accidents); *Leischner*, 127 Ill. App. 3d at 177 (64,000 snowmobiles).

## V. Conclusion

The plaintiff has also appealed from the decision of the appellate court in this case, which affirmed the circuit court's judgment in favor of defendant Schwinn and against the plaintiff. The plaintiff has made his appeal a conditional one, however, and seeks review only in the event that we grant North Western a new trial. Neither defendant has objected to the plaintiff's reservation of his argument. We have considered here the full range of North Western's arguments, which include several allegations of error in favor of codefendant Schwinn. The trial of the present case lasted more than four weeks and produced a transcript comprising more than 4,500 pages. Errors are not uncommon in proceedings as lengthy and complex as this. As we have seen, what errors that occurred here were harmless, given the evidence presented in this case, or were rendered moot by the parties' agreement ensuring that at least one of the defendants would be found liable. In light of our resolution of North Western's appeal, we find it unnecessary to consider the arguments raised by the plaintiff in his separate appeal against Schwinn, and, unlike the appel-

late court, we express no view on the merits of the contentions of the plaintiff that were not also raised by North Western.

For the reasons stated, the judgment of the appellate court is affirmed.

*Judgment affirmed.*