**SECOND DIVISION**
**ANDREWS, P. J., PHIPPS, P. J.**
**RAY, J.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 16, 2015**

# In the Court of Appeals of Georgia

A15A0568. PIEDMONT NEWNAN HOSPITAL, INC. v. RA-085
   BARBOUR et al.

RAY, Judge.

This case presents the interesting issue of whether it is permissible for a trial court to allow members of a jury to use their sense of touch during a trial to determine a critical issue of fact, just as they might use their senses of sight and hearing. The issue arose when plaintiff's counsel requested and received permission for members of the jury to briefly touch both of the plaintiff's hands to determine if there was a detectable difference in the temperature of each hand, which would be an important factor in determining whether the plaintiff had Complex Regional Pain Syndrome ("CRPS"). The plaintiff claimed that his arm was damaged while undergoing a medical procedure performed at the defendant hospital, causing him to suffer from

CRPS, with one consequence being that his damaged arm was much colder than normal. The experts who testified on behalf of the parties disagreed as to whether there was a meaningful difference in temperature of the plaintiff's hands, even though they agreed that a temperature asymmetry would be an important factor in determining whether the plaintiff suffered from CRPS.[1]

Under the circumstances of this case, we do not believe that the trial court abused its discretion in allowing the jurors to touch the plaintiff's hand to determine for themselves which of the two experts was correct as to this critical fact, and possibly, which expert had greater credibility as to his medical diagnosis of whether the plaintiff did or did not suffer from CRPS. Additionally, we find that the trial court properly acted within its discretion by issuing its spoliation order regarding evidence which the defendants admittedly failed to preserve for trial. However, we also find that evidence as to future lost wages which the plaintiff might suffer was at best speculative and unsupported. Accordingly, we affirm the judgment in principle part,

---

[1] Symptoms of CRPS include skin discoloration, impacted nail or hair growth, pain disproportionate to the injury, over sensitivity to touch, and temperature differences in the affected limb.

but reverse the judgment as it pertains to the $1,195,957 awarded for future lost wages.

On June 1, 2011, Plaintiff-Appellee Michael Barbour arrived at Appellant Piedmont Newnan Hospital ("Piedmont Newnan") complaining of chest pains and difficulty with breathing. He underwent a series of diagnostic tests to assess his heart, principally a nuclear stress test to compare the blood flow into his heart while he was both at rest and under stress. This procedure involves injecting a small amount of nuclear material into the bloodstream to act as a tracer to the heart to facilitate the taking of a "resting" image of the patient's heart. Thereafter, the patient then exercises to increase his heart rate, then receives another injection of the same nuclear tracer, and then a second image of the "stressed" heart is taken. As to Mr. Barbour, in each instance the nuclear tracer was introduced through an IV catheter which was originally placed in his left arm when he first received treatment upon arriving at the emergency room.

The "resting" phase of the test went off without any outward indication of a problem. The nuclear material was introduced into Mr. Barbour's vein, and Piedmont Newnan proceeded to take an image of his heart. Thereafter, Mr. Barbour proceeded

3

to the "stress" portion of the test. First, he began walking on a treadmill to induce his heart to reach the target rate; this took approximately ten minutes. Then, the radioactive tracer was injected into the catheter in Mr. Barbour's arm while he remained on the treadmill. Eventually, however, Mr. Barbour felt a sharp pain and cried out, leading the nurse to immediately terminate the test as she believed that the tracer material had infiltrated Mr. Barbour's arm, meaning that the material was not contained within his vein and bloodstream, but had leaked into the soft tissue of his arm. Mr. Barbour's arm swelled and became discolored, and a bulge appeared near where the IV port was located. No image of Mr. Barbour's heart was taken as the attention of hospital staff shifted to treating his arm. Eventually, Mr. Barbour was discharged with specific instructions related to his arm.

The pain in Mr. Barbour's arm did not subside. He called a nursing hotline four days after the infiltration complaining that it was worsening, including that his arm was burning, tingling and swollen. He visited his primary care physician three weeks later, having much the same complaints, including that the arm was "icy hot." After the pain spiked further while playing softball, he sought care from two nearby emergency rooms, including at Piedmont Newnan. Eventually, neurologist Dr.

Knobler diagnosed Mr. Barbour with CRPS, a diagnosis that was later confirmed by Dr. Andrew Koman, an orthopedic surgeon and expert on CRPS. It was Dr. Koman's opinion that the infiltration of the nuclear tracer outside the vein, combined with blood then escaping the vein, had a damaging impact on the nerve.

Mr. Barbour underwent a series of medical procedures to address the problems in his arm. Dr. Koman performed two surgeries on a nerve in Mr. Barbour's left arm. Dr. Erik Shaw of the Shepherd's Clinic, who specializes in CRPS, also provided treatment to Mr. Barbour. These surgeries and medical treatment were an issue at the trial, with Piedmont Newnan claiming that they were the source of Mr. Barbour's CRPS, if indeed he really had this condition, which Piedmont Newnan did not concede.

In May 2012, Mr. Barbour and his wife filed a medical malpractice case against Piedmont Newnan and one of the nurses involved with his care during the subject stress test, alleging that they failed to ensure that the IV was correctly installed and properly functioning prior to the test, thus causing the infiltration of the nuclear tracer

in his arm and the development of CRPS.[2] The case proceeded to trial on May 5, 2014

and lasted for nine days. Piedmont Newnan denied negligence in its treatment of Mr.

Barbour, denied that he had CRPS, and, to the extent that he did, denied that anything

it did caused the condition, instead placing the blame on the physicians who had later

treated Mr. Barbour.

The trial developed into the classic "battle of the experts," with Mr. Barbour's

expert testifying that he did have CRPS and Piedmont Newnan's expert claiming

otherwise. First, Piedmont Newnan called Dr. Arnold Weiss to testify that Mr.

Barbour did not have CRPS.[3] Dr. Weiss stated as much, even though he admitted that

Mr. Barbour was in chronic pain and that he saw nothing in the medical records to

suggest that he was faking. He also acknowledged that Dr. Komen, one of Mr.

Barbour's treating physicians, was very qualified and knowledgeable about CRPS.

Importantly, he admitted that, in his practice, he would not confirm or rule out a

---

[2] The jury reached a verdict in favor of the nurse, but against Piedmont for $4,470,903, which included $183,244 for past medical expenses; $790,000 for future medical expenses; $51,702 for past lost wages; $1,195,957 for future lost wages; $1,000,000 for past pain and suffering; $500,000 for future pain and suffering; and $750,000 for Mrs. Barbour's loss of consortium claim.

[3] Piedmont called Dr. Weiss as its witness during Mr. Barbour's case and, thus, out of order to accomodate his schedule.

6

CRPS diagnosis without examining a patient, even though he was offering testimony that Mr. Barbour did not have CRPS without having ever examined him.

Plaintiff's counsel gave Dr. Weiss that opportunity, asking Dr. Weiss to examine Mr. Barbour's arms in the courtroom, doing so in front of the jury for all to see. As Mr. Barbour outstretched both arms and hands, Dr. Weiss stated that he did not see evidence of skin changes, that the coloring appeared pink on both arms, and that the pattern of hair growth was the same. When asked whether he felt a temperature difference from one hand to the other, Dr. Weiss seemingly hedged his opinion, first stating that they were "roughly the same," but then acknowledging that the left "is a little cooler."

Mr. Barbour later called Dr. Shaw to testify. Given the same opportunity to examine Mr. Barbour before the jury, Dr. Shaw pointed out both the discoloration and waxy appearance of Mr. Barbour's injured arm, as well the differing levels of hair growth in the arms. Then, touching each of Mr. Barbour's hands, Dr. Shaw testified that his left hand is "very cool compared to the right arm." In response to a question as to whether the temperature difference was noticeable, he stated "generally, you'll be able to feel it. . . . You'll generally be able to detect it with human touch. It has to

7

be greater than one or two degrees difference. . . . It's pretty easy to detect, so it's got to be greater than one to two degrees."

Based upon Dr. Shaw's testimony that there was a clear temperature asymmetry between the left and right arms and that it was relatively easy to detect, Mr. Barbour's counsel requested permission from the court to allow the jurors to feel Mr. Barbour's hands for themselves. Piedmont Newnan objected, stating that "this is so relevant to being incredibly prejudicial." The trial court overruled the objection, allowing any jurors who wished to touch Mr. Barbour's hands to do so. Several jurors did.

1. On appeal, Piedmont Newnan claims that the trial court abused its discretion in permitting jurors to touch Mr. Barbour's hands, arguing that it impermissibly allowed them to make a medical diagnosis, that it made them witnesses who could not be cross-examined, that the exercise had no probative value, and that such a practice has been rejected by other courts around the country. While we recognize that there are some jurisdictions that would seemingly frown on the request that was granted here, such opinion is by no means universal, as other jurisdictions have allowed jurors to touch a plaintiff in appropriate circumstances. Indeed, although we find no Georgia case directly on point, our own precedent indicates that jurors may utilize all their

8

senses, not just hearing and eyesight, in determining factual disputes put to them. *Union v. State,* 7 Ga. App. 27, 27 (4) (66 SE 24) (1909) (no error if jurors tasted liquid from jug admitted into evidence in illegal whiskey trial); *Morse v. State*, 10 Ga. App. 61, 63 (3) (72 SE 534) (1911) (jurors may utilize all of their senses, including taste and smell, in determining whether liquid was an intoxicating liquor). We also reject the argument that allowing the jurors to touch Mr. Barbour's arms was allowing them to make a medical diagnosis, but rather find that this exercise merely was a tool to aid them, as laymen, in deciding a question of fact that was squarely put to them, that is, whether one arm was colder than the other, and that the information so gleaned was probative to the issues in the case.

(a) At the outset, we note that Piedmont Newnan seeks to expand within its enumerations of error on the actual objection that it lodged at trial. As previously noted, at trial Piedmont Newnan objected to allowing the jurors to touch Mr. Barbour's arms because "[t]his is so relevant to being incredibly prejudicial."[4] This

---

[4] "[I]n order to raise on appeal contentions concerning admissibility of evidence, the specific ground of objection must be made at the time the evidence is offered, and failure to do so will be considered as a waiver." (Citation, punctuation,

objection is certainly unclear and awkwardly composed, and possibly an error in transcription, as Piedmont Newnan's counsel likely said or meant to say that the request was "irrelevant" rather than "relevant."

Pursuant to O.C.G.A. § 24-4-401, relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Clearly, the temperature of Mr. Barbour's hands was a relevant factor to the experts' diagnosis of whether he suffered from CRPS; that is undisputed. Perhaps the objection really went to the fact that Piedmont Newnan contended that it did not cause any CRPS suffered by Mr. Barbour, but that such condition, if it existed, was caused by the doctors who subsequently provided treatment to him. Yet, given its contention that Mr. Barbour did not even have CRPS, it is hardly fair for Piedmont

---

and footnote omitted.) *Clemons v. State*, 257 Ga. App. 96, 103 (3) (574 SE2d 535) (2002).

Newnan to argue that it was irrelevant whether at trial one arm was colder than the other.[5]

After touching Mr. Barbour's hands, it might indeed have been prejudicial to Piedmont Newnan if the jury believed that its expert was not truthful in his testimony about a temperature difference. Yet, the facts are the facts, and to exclude evidence merely because the information would be prejudicial to one side or the other is "an extraordinary remedy which the courts should invoke sparingly, and the balance should be struck in favor of admissibility." (Punctuation and footnote omitted.) *Williams v. State*, 328 Ga. App. 876, 879 (1) (763 SE2d 261) (2014).

(b) Citing to *Schaffner v. Chicago & North Western Transp. Co.*, 129 Ill. 2d 1, 30 (III) (541 NE2d 643) (1989), Piedmont Newnan argues that allowing jurors to touch Mr. Barbour was prejudicial because it could have the effect of converting the jurors into witnesses for the party conducting the test and that opposing counsel was

---

[5] We note that, interestingly, Piedmont Newnan lodged no objection on the record to either of the experts touching Mr. Barbour's hands in the courtroom and testifying as to their findings, thereby supporting our conclusion that information as to the current temperature of Mr. Barbour's hands was, indeed, relevant.

unable to cross-examine the jurors on their experience.[6] Of course, this presupposes that the jurors who touched Mr. Barbour's arms would find a difference in temperature and disbelieve Piedmont Newnan's experts. If the temperature differential was non-existent or negligible, as Dr. Koman so testified, then this might have been the best evidence in support of Piedmont Newnan's defense. In any event, longstanding precedent from this Court flatly rejects the argument that jurors who use their senses to make determinations of facts are turned into witnesses, immune from cross examination. In *Union*, supra, where the defendant was tried for a violation of Prohibition laws related to the possession of alcohol, the trial court permitted the jury to take with them to the jury room the jug containing the liquid alleged to be illegal whiskey. The defendant complained on appeal that some of the jurors might have tasted the substance, and if so, that he was denied an opportunity to cross-examine them on their findings and that they may have communicated their conclusions to

---

[6] We must note that we are not deciding whether it is permissible for some, but not all, of the jurors to touch the Plaintiff's arms. While Piedmont Newnan posed a rhetorical question in its brief that seemed to implicity challenge the propriety of less than all jurors participating in the exercise, it cannot be fairly said that it alleged such as an error. It certainly was not raised as an objection at trial or specifically included as an enumeration of error on appeal. Accordingly, this issue was waived.

others on the jury. Our learned colleagues of 100 years prior were unpersuaded, stating

> [W]e do not see that [tasting the liquid] would have been different from [a juror's] looking at the wine glass and determining from the peculiarity of its fracture . . . that it was a glass. Each is alike a case of identity by one of the five senses. In the identification of the glass, it would be by that of sight. The identification of the contents of the jug, would be by that of taste, or it might be that of smell. . . . The view which a certain juror might take of such physical testimony in discussing it with his fellow cannot affect its admissibility, and is not to be considered as testimony delivered beyond the hearing of the defendant on trial. If that were true, the defendant would be entitled to rebut the impression which the juror received from his sense of sight, or to prevent him from communicating it to fellow jurors, unless he first be sworn as a witness.

Id. at 27 (4).

In the appeal before us, Piedmont Newnan brings no complaint that jurors were allowed to look at Mr. Barbour's arms to see if the left arm was discolored, which as we know is a potential symptom of CRPS. There is no argument that the jurors should not have been permitted to use their sense of sight to look for nervousness, fidgeting, sweating, or other nonverbal indications that a witness might be lying.[7] Why, then,

_____

[7] The jury's use of sight is such an important tool that normally a witness cannot express an opinion as to whether a perpetrator depicted on a video of a crime is the defendant on trial; that determination is generally within the sole province of the jury. See *Carter v. State*, 326 Ga. App. 144, 147-149 (3) (756 SE2d 232) (2014).

13

cannot the sense of touch be utilized by the jury in appropriate circumstances, limited by the exercise of the sound discretion of the trial court, just like the senses of sight, hearing, and even taste have been so allowed? "It is certainly in the interest of truth – the supreme object of all legal investigation – to let the jurors, who are the final arbiters of the question, apply to its solution the most accurate sense they are capable of applying." *Morse*, supra.[8]

Piedmont Newnan acknowledges that courts in other jurisdictions have permitted jurors to touch an injured body part, but argues that such cases were merely for the jury to determine the extent of an injury, and that in this case the jury was being asked to make a medical diagnosis. See *Grubaugh v. Simon J. Murphy Co.*, 209 Mich. 551, 561-562 (3) (177 N.W. 217) (1920) (in an action for injuries, it was not error to permit plaintiff to enter the jury box and allow jurors to feel a lump on his arm). First, the purposes for which other courts have allowed jurors to touch a

_____

[8] See *Mitchell v. State*, 283 Ga. 341, 342 (1) (659 SE2d 356) (2008) (jury was authorized to use its senses to determine length of the knife blade used in commission of crime); *White v. State*, 203 Ga. App. 889, 891 (4) (418 SE2d 149) (1992) (jury could use their sense of sight and touch to determine that subject knife was a least three inches in length and, thus, illegal, despite the lack of testimony on this point by any witness); *Jones v. State*, 150 Ga. App. 300, 301 (3) (257 SE2d 370) (1979) ("identification of evidence by any of the five senses is not forbidden").

plaintiff are not as strictly limited as Piedmont Newnan asserts. For example, in *McAndrews v. Leonard*, 99 Vt. 512 (134 A. 710, 713-714) (1926), the trial court allowed the jury to touch the head of a plaintiff to feel whether his skull was fully healed with new bone as the defendant so argued, or only partially healed with fibrous tissue instead of bone as the plaintiff contended. The parties' experts, not surprisingly, had disagreed. The trial court allowed the jury to touch the skull to aid them in determining who was correct. See also *Sampson v. St. Louis & San Francisco R. Co.*, 156 Mo. App. 419 (138 S.W. 98, 99-100) (1911) (affirming trial court's ruling allowing jury to touch plaintiff's arm, when the dispute concerned circulatory issues and the temperature of the arm); *Curry v. American Enka, Inc.* 452 F. Supp. 178, 181-182 (E.D. Tenn 1977) (permission may be granted for jurors who wish to feel a part of the plaintiff's body for purposes of resolving some disputed or controverted fact). Compare *Ateser v. Becker*, 272 A.D.2d 219, 219 (708 N.Y.S.2d 76) (2000) (trial court properly refused to allow jurors to touch plaintiff's legs to feel temperature differential). Thus, the persuasive authority from other jurisdictions support either side of the controversy before us.

(c) Finally, Piedmont Newnan contends that the trial court erred by essentially allowing jurors to make a medical diagnosis. Again, we disagree. The touching of Mr. Barbour's arm allowed the jurors to determine two things: (1) whether the left arm was indeed cooler than the right arm and (2) which expert, Dr. Shaw who testified on behalf of Mr. Barbour, or Dr. Weiss who testified on behalf of Piedmont Newnan, was more credible on this point and perhaps more credible overall. Any juror who touched Mr. Barbour's arms was permitted to take any information gleaned therefrom into consideration, along with the balance of the experts' testimony and other evidence presented, in determining this issue in the case. Both experts had impressive credentials; yet, their conclusions were so disparate. Certainly, credibility could play an important role in the jury's evaluation and assessment of the value of their opinions. At the end of the day, whether or not the trial court had allowed the jurors to touch Mr. Barbour's arms, the jury had to make the final decision as to whether Mr. Barbour suffered from CRPS and, if so, whether Piedmont Newnan was responsible.[9]

---

[9] The jury is not some static entity that is required to accumulate and plot the evidence presented like a scientist or mathematician, allowing the final result to be determined through regression analysis. Rather, the process of deciding facts and making decisions by a jury is a dynamic process, as so aptly demonstrated by actor Henry Fonda in the movie *12 Angry Men*.

16

2. Piedmont Newnan argues that the trial court abused its discretion in applying spoliation sanctions against it due to Piedmont Newnan's admitted failure to preserve the digital images of the "resting" test of Mr. Barbour's heart despite the written request from Mr. Barbour's attorney for his records. Piedmont Newnan argues that these sanctions were inappropriate because (1) there was no spoliation because these images were not "necessary" for Mr. Barbour's case and (2) that the sanctions were prejudicially overbroad. We are unpersuaded and believe that the trial court acted within the broad discretion available to it under the facts. See *Phillips v. Harmon*, ___ Ga. ___, *6-8 (II) (Case Nos. S14G1868, S14G1893, S14G1895, decided June 29, 2015); *Wal-Mart Stores, Inc. v. Lee*, 290 Ga. App. 541, 545-546 (1) (659 SE2d 905) (2008). Additionally, it is clear from the record that Piedmont Newnan, while not agreeing that the trial court's finding of spoliation was correct and consequently that any spoliation sanctions should be imposed, did agree that the sanctions fashioned by the court as a response to the trial court's finding of spoliation were appropriate, proportional and bore a rational relationship to missing records of Mr. Barbour's heart.

On September 23, 2011, legal counsel for Mr. Barbour wrote to Piedmont Newnan asking for a complete copy of his medical records, including "[c]opies of any Radiology Diagnostic CDs or Films[.]" Unquestionably, this request would have included the images of his heart that were captured by the diagnostic machinery during the "resting" phase of the test. Further, within six months of the test, Mr. Barbour alerted Piedmont Newnan that he would pursue legal action against it. Yet, despite receipt of this request and knowledge that a lawsuit would be forthcoming, Piedmont Newnan did not preserve and produce these images. These images, which had remained stored on the imaging device and were never downloaded, were lost when the hospital moved to a new location and the vendor of the portable medical imaging device erased the hard drive before moving the machine.

The importance of these images was hotly debated. Mr. Barbour claimed that without the images, he was hampered in his effort to discover and establish that the catheter was not working properly during the "resting" phase of the test. His theory at trial was that the negligence on the part of Piedmont Newnan may have occurred either during this first phase, or the "resting" test, and if not, that it occurred during the second phase, or the active "stress" test. Without the images to show whether the

18

nuclear tracer made it to his heart during the "resting" test, the only objective evidence was lost and his burden to prove when and under what circumstances the leakage occurred was made much harder.

In opposing the spoliation motion, in addition to contending that there was no pending or contemplated litigation when the images were erased, Piedmont Newnan argued, as it does here, that the "resting" heart images were not necessary because it essentially was clear that the infiltration occurred during the "stress" phase of the test. The nurses and technicians who performed the tests would have testified as such, and Mr. Barbour did not experience any of the symptoms of the infiltration until the "stress" portion of the test was underway. Thus, as the argument goes, there was no reason to preserve the images captured during the "resting" phase.

One might say that Piedmont Newnan's argument essentially "begs the question." It is true that the testimony of its employees would have supported its contention that there was no problem during the "resting" phase of the test and, indeed, the fact that no infiltration to Mr. Barbour was detected during that time also lends credibility to this claim. However, the images themselves would have been important proof one way or the other because it would have shown whether the tracer

19

was making its way to Mr. Barbour's heart. Assuming arguendo that the IV was not working correctly during the "resting" test, despite the testimony of Piedmont Newnan's employees, the images were the only objective way that Mr. Barbour likely could have proven otherwise. We cannot quarrel with the trial court's conclusion that these images should have been preserved.

As we have previously stated,

Spoilation refers to the destruction or failure to preserve evidence that is necessary to contemplated or pending litigation. And, when key evidence has been destroyed, exclusion of evidence or dismissal of a case may be warranted. In determining whether such a severe sanction is warranted the trial court must consider: (1) whether the defendant was prejudiced as a result of the destruction of the evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded.

(Punctuation and footnotes omitted.) *Bridgestone/Firestone North American Tire, LLC v. Campbell*, 258 Ga. App. 767, 768-769 (574 SE2d 923) (2002).

It appears that the trial court thoughtfully applied these factors as embedded in its order of June 19, 2013, finding that Piedmont Newnan was responsible for

20

spoliation by not acting to preserve the digital images of Mr. Barbour's heart and applying its narrowly tailored sanctions.[10] In reaching this conclusion, we are mindful that our standard of review is whether the trial court abused its wide discretion. See *Phillips*, supra at *8 (II). This we cannot find.

3. The nearly $4.5 million verdict in favor of Mr. Barbour included $1,195,957 for future lost wages. Piedmont Newnan appeals the award for future lost wages, complaining that there was not sufficient evidence to support this claim and that it was based merely on speculation. We agree.

Mr. Barbour's claim for future lost wages was based merely upon his fear that he would lose the job in which he was employed at the time of the trial. Yet, in November of 2013, his treating physician released him to work fulltime without any restrictions at his desk job at Dick's Sporting Goods. His supervisor testified at trial that he had met all of his performance targets for his current position and even described him as "amazing." While he had missed some work for medical treatments, he was paid 100 percent of his pay during his sick leave as per company policy; his

---

[10] Piedmont Newnan and/or their witnesses were prohibited from testifying or arguing that the catheter was properly ported in the "resting" phase.

supervisor testified that Dick's Sporting Good's does not "hold [attendance] against" employees when absent for medical reasons and that Mr. Barbour is able to meet the targets and goals of his position when he is at work.

The law in Georgia is that future lost wages may be recovered only when such losses are "reasonably certain" and not speculative. See *Ike v. Kroger Co.*, 248 Ga. App. 531, 533 (6) (546 SE2d 903) (2001) (trial court correctly refused to instruct the jury on future lost wages where the plaintiff, who was working, had not shown "either that she had a permanent injury or that she would be entitled to lost wages for any particular period"). There must be evidence from which the jury can estimate or reasonably infer the loss or decrease in earning capacity, and a claim for future lost wages cannot be based upon pure conjecture or speculation. See *Jones v. O'Day*, 303 Ga. App. 159, 161-162 (692 SE2d 774) (2010). While there was ample evidence at trial that Mr. Barbour's injury was permanent, the same cannot be said that he would suffer lost wages in the future, particularly considering the glowing reviews of his job performance, his good standing with his supervisor, his employer's policy of accommodating workers with health issues, and the fact that he receives full pay when he must miss work for medical treatment.

The trial court should have granted Piedmont Newnan's motion for directed verdict as to future lost wages. Accordingly, we hereby reverse that award.

*Judgment affirmed in part and reversed in part. Phipps, P. J., concurs, Andrews, P. J., concurs in judgment only to Divisions 1 and 2 and concurs fully otherwise.*