NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190543-U

NO. 4-19-0543

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 5, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| DENISE E. TORBERT, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | De Witt County |
| SHIRLEY MOORE, TENA M. SCHNEIDER, | ) | No. 13L1 |
| and BRADY REALTORS, INC., | ) | |
| Defendants-Appellees. | ) | Honorable |
| | ) | Gary A. Webber, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Presiding Justice Steigmann and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not err by preventing plaintiff's counsel from questioning potential jurors during *voir dire* regarding the difference between civil and criminal burdens of proof.

(2) Because plaintiff could not identify a questionable juror that heard the case as a result of the trial court's refusal to remove jurors for cause, this court will not review the propriety of the trial court's refusals.

(3) Due to procedural defaults by plaintiff, this court will not consider the trial court's decisions to limit the testimony of plaintiff's witnesses regarding termite damage.

(4) Because of the jury's decision on the issue of liability, the jury did not reach the issue of damages and this court need not consider whether the trial court erred in barring expert testimony on plaintiff's post-concussive syndrome, an issue solely related to damages.

(5) Plaintiff failed to develop argument, supported by relevant authority, to

establish the trial court erred by barring plaintiff from calling a rebuttal witness.

(6) The trial court's decision to deem a statement by plaintiff's counsel as a judicial admission, even if erroneous, did not entitle plaintiff to a new trial, as plaintiff suffered no prejudice as a result of the admission.

¶ 2         In February 2013, plaintiff, Denise E. Torbert, filed a complaint against defendants, Shirley Moore, Tena M. Schneider, and Brady Realtors, Inc. (Brady Realtors), after plaintiff fell through the floor of a residence owned by Moore. After a trial, the jury found in favor of the defendants. Plaintiff appeals, arguing (1) she should have been allowed to question potential jurors during *voir dire* regarding the difference between the criminal and civil burdens of proof, (2) the trial court denied her a fair trial by failing to remove multiple jurors for cause, (3) the court erred by not allowing plaintiff to present testimony by two witnesses regarding the existence of termites and termite damage, (4) the court erroneously barred plaintiff's treating neurologist from testifying plaintiff suffered post-concussive syndrome, (5) the court erroneously denied plaintiff's request for a rebuttal witness, and (6) the court erred by treating a statement made by her counsel in a written response to defendant Moore's motion *in limine* as a judicial admission. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4         On August 6, 2011, Moore listed residential property for sale through Brady Realtors. Schneider, a sales associate with Brady Realtors, was the listing broker for the property. The property is located in rural De Witt County. On the two- to three-acre property was a two-story all-brick home built shortly after World War I. Throughout trial proceedings, the house was referred to as the Barnett House. The Barnett House had four entrances. One opened to a small landing, measuring approximately three feet by three feet, attached to two sets of

- 2 -

stairs. One set of stairs led to the main floor. The other set led to the basement. Tile covered the landing's surface.

¶ 5 On August 11, 2011, Moore signed a Residential Real Property Disclosure Report. Moore identified no known material defects or unsafe conditions on the property, including no "material defects in the *** floors." In addition to making X's in the "No" and "N/A" columns, Moore provided additional information. Moore wrote, in part, "Fireplace SAFE + USED!" and "septic system drained in last 2-3 yrs."

¶ 6 Plaintiff, a real-estate broker, represented potential buyers of Moore's property, her son and daughter-in-law, David and Rachel Torbert. On October 1, 2011, plaintiff entered the entrance with the landing at the Barnett House. When she stepped onto the landing, the floor collapsed beneath her. Plaintiff fell into a hole and suffered injuries.

¶ 7 In her complaint, plaintiff asserted claims of negligence against all defendants and a claim of *respondeat superior* against Brady Realtors. Plaintiff asserted Moore owed her a duty to exercise reasonable care to maintain the property in a reasonably safe condition and to warn her of dangerous latent conditions. Plaintiff asserted Brady Realtors and Schneider (collectively Brady defendants) were negligent for inviting plaintiff to enter the Barnett House although Schneider "knew, or in the exercise of reasonable care, should have known that the landing was in a defective and unsafe condition" and for failing to warn plaintiff the landing was unsafe. In her answer, Moore asserted a complaint of comparative negligence, asserting plaintiff failed to maintain a proper lookout for the conditions of the premises and failed to exercise due care while on the property.

¶ 8 The jury trial was held in May 2019. We note we need not summarize the

testimony of each witness to resolve this appeal.

¶ 9 Plaintiff's first witness was Daniel Moore, who owned a septic-tank pumping business. Daniel testified he met plaintiff at the Barnett House on a Saturday to locate a septic tank. Daniel arrived first. Before plaintiff arrived, he attempted to locate the tank by walking around the lawn. When plaintiff arrived, the two went to the house. Daniel wanted to go to the basement to find the main pipe leading to the septic tank. After plaintiff opened the door, she stepped onto the landing and the floor collapsed. Daniel did not see plaintiff hit the ground—"[i]t all happened so fast." Daniel called 911. Before authorities arrived, Daniel found a stepstool-like ladder in a shed. He used the ladder to help plaintiff out of the hole. Daniel did not have to pull plaintiff out. He helped her get on her feet by stabilizing her. Plaintiff's eye or head was cut. Daniel drove plaintiff to the emergency room.

¶ 10 On cross-examination, Daniel testified plaintiff did not tell him to be careful when stepping into the house or onto the landing. When Daniel looked into the hole, he could see plaintiff standing. Plaintiff's head was at the top of the opening.

¶ 11 Phil Smith testified he had known plaintiff for a long time. Smith worked part-time helping build houses. Smith also had experience with remodeling jobs involving structural repairs. He had been to the Barnett House before the floor collapsed. Plaintiff's son and daughter-in-law asked him to look at the house to see if there was something that needed repaired or fixed. During his inspection of the house, Smith went to the basement. He examined the pine stairs that connected the basement to the landing. The stairs appeared to be deteriorating. Explaining how the stairs connected to the landing, Smith testified the stringer went from the basement floor to the edge of the rim joists on the platform of the stairs of the landing. The

stringers, like the stairs, were made of pine. The stringers were also in disrepair. It seemed there was a lot of water damage to the stairs. It was his common practice to carry a screwdriver to test floor joists to see if termite or water damage exists. Smith poked a screwdriver through the joists. Plaintiff's counsel asked if Smith at any point informed plaintiff he thought the stairs were at imminent risk of collapse, Smith responded, "I didn't think it was ready to collapse, but they needed repaired."

¶ 12　　　　On cross-examination, Smith testified he told plaintiff about his observations. He did not communicate his findings to Moore. Plaintiff did not go into the basement with Smith.

¶ 13　　　　David Torbert, plaintiff's son, testified plaintiff was his realtor. David and his wife, Rachel Torbert, were interested in the property. They liked that it was secluded and a brick home. There was lots of room to have a family. David was concerned about the home. The windows did not seem flush. The fireplace "looked used." A cistern was in the basement, which was a bit concerning, as it was very old. He was also concerned about not being able to find the septic system.

¶ 14　　　　According to David, he had been to the house two times before the collapse. When he entered the home, he noticed a small crack almost as soon as he walked in. Plaintiff noticed the same.

¶ 15　　　　On cross-examination, David testified he knew the house was over 90 years old. He wanted to buy the house but did not do so because of the price. When David noticed the crack in the floor, he "heard the noise first." He heard a popping sound when it was stepped on. David stepped on another area of the landing and did not hear a sound. David and his wife went to the basement. Plaintiff mentioned she would say something to the seller's realtor about the crack.

During the second visit, Rachel's grandparents visited the home as well. They entered the house the same way. Plaintiff was concerned because of the age of the grandparents "and there was some softness when you stepped on it." Plaintiff said, "Please be careful because there's a crack here." Everyone crossed the landing. No one seemed to take special precautions. David did not encounter any other problems when going to the basement.

¶ 16          When David mentioned the "softness," he testified the floor "wasn't firm." According to David, "[t]here was just kind of a slight give around that crack, so where it dipped just slightly as you put pressure on it." Plaintiff cautioned the grandparents "because there was a crack and there was some softness."

¶ 17          On redirect examination, plaintiff's counsel asked David if he could see underneath the tile. He testified, "No, you could not."

¶ 18          Matthew Tool, who performed excavating and septic inspections, testified he had been to the house before the collapse for a septic inspection. Tool was unable to find the tank on his first trip there. On his second visit to the house, plaintiff met Tool there. She let him into the house so he could find where the plumbing went through the foundation wall. Tool and plaintiff went through the east door of the house. When Tool walked through the door, plaintiff told him to be cautious of his step. When Tool saw the condition of the floor, "obviously, I didn't want to take the chance of falling through that." The floor "looked very compromised because when you went in the door you couldn't just avoid it." The landing was very small. Tool stepped over that part to get to the basement, and, when he returned, he did the same. Plaintiff did not enter the house with Tool. Tool did not locate the septic tank.

¶ 19          On cross-examination, Tool explained what he meant by "compromised." Tool

testified the "tile/linoleum was crumbling, cracked." Tool did not want to step on it "by any means." Tool explained the landing was approximately four feet by four feet. The area where the linoleum or tile was crumbled was "[m]aybe a three-foot area in the very middle of it." Tool agreed it was patently obvious. It was a circular shape.

"Q. And you went down the stairway, there were no

problems with that; you just went down the stairway and didn't

discover any problems with the stairway or the septic area or

anything like that?

A. I believe there was some access underneath the stairs,

and I told her it didn't look very good."

¶ 20 Tool could not pinpoint when he was at the house. He believed it was August or September 2011. During his second visit to the property, plaintiff did not enter the house with Tool. Before he entered the house, plaintiff told Tool to be careful of the landing. When Tool saw the crumbling flooring, he wondered why anyone was allowed access through that door. Tool did not agree from what he saw that it was reasonably foreseeable the landing would collapse.

¶ 21 On redirect examination, Tool stated "whatever was under the tile" was not open and obvious as it was not exposed. He could not see through it.

¶ 22 Manda Fuiten, an appraiser, testified she performed an appraisal of the property in mid-September 2011. The report was completed on September 21, 2011. Plaintiff hired Fuiten to do the appraisal. Fuiten remembered the floor had some broken tile and a soft spot when she walked on it. Fuiten did not believe she walked across it but stepped back because it was soft.

Plaintiff did not tell Fuiten about the landing. Fuiten agreed the appraisal did not guarantee the home was free from structural defects. Fuiten stated if she noted defects or anything unusual, she would note it, but "for things that can't be seen," she would defer to a home inspector.

¶ 23　　　　Fuiten indicated in the appraisal report the termite status was unknown. When asked if she told plaintiff "the landing inside the backdoor was on the verge of imminent collapse," Fuiten said, "Well, yeah. I told [plaintiff] that there was a soft spot there."

¶ 24　　　　On cross-examination, Fuiten testified she did not know Moore. Neither Moore nor Schneider received a copy of the appraisal report. In the report, Fuiten, who had been appraising houses since 1994, reported the following about the house: "Upstairs has three bedrooms, bath, and a sunroom. There is a walk-up attic. Floor at backdoor entrance has broken tiles and floor is soft. Some peeling paint at back entrance. Some knob and tube wiring. Overall, subject has been updated and well maintained." Fuiten further reported there were "no physical deficiencies or adverse conditions that affected the livability, soundness, or structural integrity of the property." Fuiten noted there was a photograph in her report that was entitled "back entrance floor soft." The photograph was to document the condition of the floor at the time of her inspection. Defense counsel asked about the photograph, stating, "I am looking for cracks. Are they more kind of like spider-like cracks that maybe the photograph is not picking up?" Fuiten testified, "It was—all I can remember is that it was soft." Fuiten testified the report indicates "broken tile and floor is soft." Fuiten stated the pictures "aren't very good *** after they have been run off, you know, several times."

¶ 25　　　　Fuiten did not agree there was a three-foot expanse of crumbling, broken tile or linoleum. She said she would not have walked on it if there was crumbling tile. Fuiten could not

tell if the landing was in imminent danger of collapsing. The floor was covered with tile. She could not see anything underneath it.

¶ 26 Harlan Powers, plaintiff's brother and managing broker, testified he saw his sister in the emergency room after the floor's collapse. Plaintiff's eyes were swollen shut. She was "[v]ery incoherent" and "lucky to be here." After leaving the emergency room, Powers went to the Barnett House. Powers photographed the hole under the collapsed floor. There was a stepladder in the hole. He estimated the hole was eight to ten feet deep. Powers took a piece of the floor. He identified it for the jury. Powers further testified about the physical and mental toll of the fall, expressing plaintiff had gone from being the first in and the last to leave, to coming in late morning or close to noon. Powers believed the fall affected plaintiff's ability to work, changing her work ethic tremendously.

¶ 27 Clair Camille Tedrick testified as an adverse witness. Tedrick worked for Brady Realtors. At the time of the collapse, Tedrick was Schneider's managing broker. Tedrick testified if a homeowner is aware of a non-working septic tank and underlying structural problems, those issues must be disclosed on the disclosure form.

¶ 28 The videotaped evidence deposition of Moore was played for the jury. Moore's counsel performed the direct examination. The deposition was taken in January 2018. Moore was born on February 22, 1940. She was a retired registered nurse.

¶ 29 Moore testified about the Barnett House. Moore believed the house was built around 1921 or 1916. Moore's grandfather bought the house in 1957. Moore's maternal uncle received the house at some point. When he died in probably 1997 or 1998, Moore's mother acquired the home, but she did not reside in it. Moore acquired the house in 2001 after her

mother died. After Moore retired, she lived in the house from 2005 to 2007. In 2007, she moved to St. Louis. The Barnett House remained vacant after that, but Moore went to the house every Saturday to monitor the condition of the home. Some work was done in the house in those years, such as the repair of a cracked window in the sunroom. Between 2001 and when she moved in, Moore drove down every Saturday from Naperville to check on the house. In that same four-year period, Moore had some renovation work done on the home. In 2010, she decided to sell the house. During her visits, she walked on the landing area many times. When asked if she noticed anything unusual about it, Moore responded, "I have no knowledge of that, no one told me anything, I never had any information." If she had known of a problem with the floor, she would have had it fixed.

¶ 30　　　　According to Moore, between 2001 and 2005, Moore walked across the landing many times. Moore testified while living there, she walked across the landing "millions of times." Moore had no knowledge of any problems with the floor. When Moore lived there, she continued with renovating and repairing the home. Moore replaced each window and the fixtures. She had an electrician do work. Moore renovated the kitchen. She wanted the fireplace to work. She hired a chimney sweep to fix the chimney. Moore had no knowledge of cracked tile or that the floor felt soft.

¶ 31　　　　Moore testified Schneider helped her sell the house. Schneider did not identify any problems with the house. Moore had no memory of seeing Fuiten's appraisal report.

¶ 32　　　　On cross-examination, Moore testified she had the stairs from the landing going to the basement repaired. When she was asked if Moore's carpenter placed tile on the landing, Moore stated, "There's no tile there." She did not recognize the picture of tile from the appraisal.

Moore did not remember what type of flooring was on the landing. Moore did not remember the flooring on the stairs to the basement. Moore testified she provided Schneider a key to the door leading to the kitchen. She stated she "might have provided her with other keys." Moore and Schneider had several discussions "on where we would allow people to go."

¶ 33 The repairs done to the basement were all done by the same contractor from Atlanta, Illinois. Moore was asked, before "October 1, 2011, did you have any termite treatment done to the house?" Moore testified "I think it was all part of it, yes." She did not know who did the work or when it was done.

¶ 34 Regarding her phone conversations with Schneider, when asked if Schneider informed her about cracked tile, Moore testified, "I don't remember that." She did not remember the conversation.

¶ 35 Moore testified regarding repairs done to the fireplace. The fireplace was intact. The chimney was not intact. She was told by a firm in Atlanta that the chimney needed flashing and interior repair. Moore testified she had the repair work done and that it was in working order. Moore testified farmers would visit her house and enjoy the fire and fireplace.

¶ 36 On redirect examination, Moore was asked if she recalled the questions about repair work performed to the tile surface of the floor where plaintiff fell. Moore had to have the floor repaired.

"Q. So when you were answering her question, was that the

repair work you were talking about?

A. Well, the whole area had to be repaired, when I saw it,

and I'm sure I gave the amount that I had to invest in that.

- 11 -

Q. Okay.

A. At my last deposition, with Goffstein.

Q. Okay. So the repair work that you were talking about was repair work that occurred after [plaintiff] had fallen; is that right?"

¶ 37    On recross-examination, Moore testified she did not remember having renovations done to the landing or stairs from 2001 until August 2011. Moore stated, "I don't remember before the fall. I do remember after the fall."

¶ 38    On cross-examination by the realtor defendants, Moore testified she did not notice a crack on the tile on the landing. Moore noticed no softness. Moore testified she was certain she and Schneider did a walk-through of the house before it was listed. At that time, Moore was not aware of a defect or problem with the landing. Moore did not remember Schneider's identifying problems or telling Moore to fix the landing. While Schneider had the listing, Moore did not remember Schneider ever telling her there was a crack on the floor. Moore did not recall Schneider telling her the floor was soft or spongy.

¶ 39    Tena Schneider testified as an adverse witness for plaintiff. In 2010, Schneider worked with ME Realty. She had the Barnett House listed at that time. The listing went to another realtor with ME Realty and then returned to Schneider with Brady Realtors. The listing reported "exceptional-brick two-story located on two peaceful acres, enjoy country living." The house was built in 1923.

¶ 40    Schneider recalled Moore telling her there had been remodeling to the home. Schneider could not say more specifically what had been done. Schneider was in the house in

2010 when she listed it. In early August 2011, Schneider was there only to list it. Schneider did not show the home. In 2011, Schneider only had one key to the home. Schneider did not recall whether Moore told her the house had been treated for termites. Before the floor collapsed, Schneider informed Moore about the cracked tile.

¶ 41		Schneider stated Moore reported on the disclosure, completed on August 11, 2011, the septic system was drained in the previous two to three years. Moore added this to the disclosure one day after plaintiff asked about the septic system. Plaintiff asked Schneider for the receipts for the work done to the house. Schneider told plaintiff Moore was difficult to work with. Moore was private, and she loved her home. At times, she could be difficult. Schneider never had the impression Moore was confused or did not understand.

¶ 42		Schneider testified her first memory of any notification about the landing was on September 26 or 27, 2011, "when the question of the cracked tile came up." Plaintiff was going to present an offer. Plaintiff asked Schneider if she had any knowledge of the cracked tile. Schneider said she did not. Plaintiff then asked Schneider to ask Moore about the cracked tile. Schneider agreed to, and she did. Schneider agreed, before the collapse, nothing prevented her from going to the house to check on the landing. Schneider acknowledged receiving an email from plaintiff on September 29, 2011. Plaintiff asked, "Do you need to see the flooring issue at the backdoor?" On October 15, 2011, Schneider emailed Moore, informing her there was no septic system, only a cistern.

¶ 43		On cross-examination, Schneider testified at no point during her representation of Moore in the sale of the property did Schneider have the impression Moore was withholding information or being untruthful.

- 13 -

¶ 44	Plaintiff testified on her own behalf. She worked for Home Sweet Home Realty. Plaintiff's son, David, and his wife, Rachel, were looking for a home. David's mother-in-law lived next to Barnett House. Rachel's mother saw the sign go up. Rachel was ecstatic, so they called Schneider. Plaintiff took David and Rachel to the home. Plaintiff noted on the first floor and on the steps, there was "blonde, cheap laminate everywhere." That was a red flag to plaintiff. Plaintiff stated when individuals restore an older home, they enhance the beauty.

¶ 45	When they visited the home the second time, Rachel's four grandparents came as well. They went in one by one because the landing was not very big. During her first trip to the house, plaintiff heard a pop when she walked across the landing. Plaintiff said "[i]t wasn't a bad pop." Instead, it felt like the tile "just wasn't adhesed correctly." During the visit with the grandparents, plaintiff went on the landing behind Chuck Kerns who was larger than herself. Plaintiff heard it pop. That time she saw a hairline crack. Plaintiff reported to Schneider the tile had cracked, and it was a hairline crack. On plaintiff's other visits to the house, she would tell those with her not to step on the tile. She did so because it seemed loose, and it had cracked before. She told the others to step over it.

¶ 46	Plaintiff was concerned because Moore was unable to provide the answers they needed. Moore could not remember who performed the work done at the house. She could not remember a lot of things plaintiff requested. Schneider could not get what plaintiff wanted from Moore. So, plaintiff decided to look into the matters more thoroughly. Plaintiff hired Fuiten to do the appraisal. She hired individuals to locate and examine the septic system. Plaintiff called individuals in Logan and De Witt Counties to try to find anyone who worked on the septic system. No one remembered the address or having cleaned out the system. The individuals

plaintiff hired to locate the septic system could not find one.

¶ 47 Danny met plaintiff at the Barnett House around 1:15 p.m. Danny was searching the yard for the septic. When plaintiff opened the door, she said, "Be careful. Step over this cracked tile. I think my kids are buying, probably, a money pit." Plaintiff walked in and the floor collapsed. She was in a confined hole.

¶ 48 On cross-examination, plaintiff testified when she asked for receipts for work done at the Barnett House, Moore provided one paper and two cash-register-like receipts. The receipts produced were for repair work done in 2003 and 2004. Plaintiff testified most people keep records or have documentation for those types of things.

¶ 49 Plaintiff testified Fuiten did not tell her about the soft floor. Danny was mistaken when he said plaintiff did not tell him anything about the condition of the landing. Plaintiff testified, "I tell anybody, even going down steps, be careful. Don't hit your head. Be careful." Plaintiff acknowledged telling others to be careful of the landing. She did not want to cause further damage. She did not know about the safety concerns. She did not want anyone to twist an ankle or break the tile further. In plaintiff's chronology, she reported telling Fuiten "about the flooring issue with the cracked tile." She further told Fuiten, "I told her to be careful because to me it seemed weak. I have people step over it or I step over and let them in another door. No one seems to be taking me seriously, so please be careful." When asked what Fuiten was to be careful of, plaintiff responded, "To be careful. I didn't want her to step on that. It seemed soft. I don't know if it was wobbly; I don't know. It just didn't seem right."

¶ 50 The jury found for Moore and the realtor defendants against plaintiff. Plaintiff filed a posttrial motion, seeking a new trial. The trial court denied the motion.

¶ 51     This appeal followed.

¶ 52                              II. ANALYSIS

¶ 53            A. *Voir Dire* Questions Regarding Burdens of Proof

¶ 54     Plaintiff argues the trial court erred by not permitting her counsel, during

*voir dire*, to ask potential jurors whether they understood or agreed with the difference in the

burden of proof in a civil case and a criminal prosecution. Plaintiff contends the difference was

particularly important as "[n]ine of forty potential jurors *** had served on a criminal jury just

one week prior to the start of trial." Plaintiff contends the questioning was necessary given the

following comment of the prospective juror Simons: "Criminal, civil, they are all the same."

¶ 55     During *voir dire* examination, plaintiff's counsel asked potential juror Simons,

"personal-injury lawsuits, what do you think?" Simons responded, "It makes no difference than

anything else. You got to hear both sides to find out where the truth is. Criminal, civil, they are

all the same. In my mind they are." A short time later, plaintiff's counsel addressed the entire

first panel of potential jurors, which included Simons. Plaintiff's counsel began, "Mr. Simons,

was it you that mentioned criminal court earlier before ***?" Simons responded, "The likeness

involved in them, yeah." Plaintiff's counsel then addressed the panel by stating the following:

>          "I've got an important issue that I want to talk about with
>
>          respect to the difference between civil and criminal, and I want to
>
>          get everyone's thoughts on that. This is a civil case. In a criminal
>
>          case, when you go and make your deliberations and render your
>
>          verdict, you are doing so in order—if you are sending someone to
>
>          jail, you are taking away their freedom because they've committed

- 16 -

a crime."

At this point, Moore's counsel objected, arguing plaintiff's counsel was improperly talking about matters of law and not inquiring into the qualifications of the jurors. The trial court sustained the objection. The court stated, in part, he understood plaintiff's counsel was "trying to show the difference possibly between burdens or something, but you need to move on from that line of questioning." A short time later, a discussion was held off the record. Plaintiff does not cite a transcript in the record.

¶ 56    When addressing a different panel of potential jurors, plaintiff's counsel asked a potential juror, "if I used the term more likely than not, what do you think that means?" Moore's counsel objected on the same grounds. The trial court sustained the objection.

¶ 57    Illinois Supreme Court Rule 234 (eff. May 1, 1997) mandates trial courts conduct *voir dire* examination of prospective jurors by asking questions the court deems appropriate as to their qualifications to serve as jurors in the case and acquaint them with the general responsibilities and duties of jurors. *Id.* The purpose of *voir dire* is to assure the selection of an impartial jury free from bias or prejudice. *Limer v. Casassa*, 273 Ill. App. 3d 300, 302, 652 N.E.2d 854, 856 (1995). Under Rule 234, a court may allow the parties to supplement the court's examination with their own inquiry "as the court deems proper for a reasonable period of time ***." Ill. S. Ct. R. 234 (eff. May 1, 1997). However, the next sentence of the rule limits the scope of the inquiry: "[q]uestions shall not directly or indirectly concern matters of law or instructions." *Id.* Although parties may inquire as to whether a prospective juror disagrees with a particular rule of law that will be applied in the case, "there is no reason to question prospective jurors as to extraneous legal principles or concepts which do not bear on whether they are willing

- 17 -

to accept and follow the instructions concerning the law of the case." *Limer*, 273 Ill. App. 3d at 302-03. Because trial courts have discretion to determine the scope and extent of the parties' examination of prospective jurors, this court will reverse only if the record shows the court's conduct thwarted the selection of an impartial jury. *Id.* at 302. On review, we consider whether the questions and procedures used by the trial court created a reasonable assurance any bias or prejudice would have been discovered. *Id.*

¶ 58 Plaintiff cites *Shaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 541 N.E.2d 643 (1989), as establishing during *voir dire* "[t]he court and *plaintiff's attorney* are allowed to identify the civil burden of proof as a preponderance of the evidence, and to distinguish for the jury this burden of proof from the criminal burden of proof" (emphasis added). This is not what *Shaffner* holds. *Shaffner* involves only the trial court's statements and questions to the jury and not whether counsel was improperly denied the opportunity to question jurors about the difference in the standards of proof. See *Shaffner*, 129 Ill. 2d at 34-35. The *Shaffner* court held the trial court's explanation of the preponderance-of-the-evidence standard fell within Rule 234's provision authorizing the trial court to " 'acquaint prospective jurors with the general duties and responsibilities of jurors.' " *Id.* at 35 (quoting Ill. S. Ct. Rule 234 (eff. July 1, 1975)). In addition, although the *Schaffner* court found the substance of the trial court's statements to be incorrect, the supreme court found the error harmless, in part, because "the jury was correctly instructed on the plaintiff's burden of proof, for it received an instruction in the form of IPI Civil 2d No. 21.01, on the meaning of the burden of proof." *Id.* at 34. The same instruction, with some minor word changes, was given to the jury in this case.

¶ 59 Plaintiff's other cases are also distinguishable. Two of the cases are *criminal*

cases. See *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984); *People v. Gregg*, 315 Ill. App. 3d 59, 732 N.E.2d 1152 (2000). Plaintiff relies on *Zehr* to show jurors may have a bias or prejudice against the burden of proof. Acknowledging *Zehr* is a criminal proceeding, plaintiff argues its analysis should be extended to show "[i]n a civil case it is important to explore bias or prejudice against a lesser burden of proof, and make sure that potential jurors understand that the civil burden applies not only to liability but also causation and damages." See *Zehr*, 103 Ill. 2d at 477-78. Plaintiff has not, however, explained how *Zehr*, involving the *trial court*'s failure to question the jury about basic constitutional guarantees to individuals charged with crimes, including the presumption of innocence (*id.* at 475-76), stands for the proposition potential jurors may have a bias or prejudice against the preponderance-of-the-evidence burden of proof in civil cases, when such a presumption does not apply. We will not take that leap for her.

¶ 60    *Gregg* involves a criminal defendant who raised the insanity defense, which had a different burden of proof, preponderance of the evidence, for the defendant and for the State, who had to prove defendant's guilt beyond a reasonable doubt. *Gregg*, 315 Ill. App. 3d at 62, 67. The First District held the trial court erred by not permitting questioning regarding the burden of proof for the insanity defense after a juror inquired "whether the standard upon which she should base her opinion of the credibility of the expert witnesses was beyond a reasonable doubt." *Id.* at 62. Plaintiff's attempt to extend *Gregg* to this case, a civil case where no juror posed a question regarding the burden of proof, falls short; *Gregg* expressly limits its holding to the issue of the insanity defense when defense counsel requests prospective jurors be so informed. *Id.* at 73.

¶ 61    The trial court did not abuse its discretion in denying this line of questioning. The record establishes the trial court created a reasonable assurance any bias or prejudice would have

been discovered. Plaintiff's counsel was able to question the jury on a wide variety of topics. The court asked questions to determine whether the jurors would be impartial. The court asked potential jurors whether they could follow the law of the case. They responded they could. The prospective jurors were asked if they could wait for all evidence to be presented and any instructions on the law to be given before making up their minds. They responded they could. During closing argument, plaintiff's counsel differentiated this case from a criminal case, telling the jury he need only prove enough to "tip *** the scales" toward plaintiff and not prove her liability beyond a reasonable doubt. The jurors who tried the case were provided the burden-of-proof jury instruction plaintiff proposed.

¶ 62        We note Simons's comment during *voir dire* did not necessitate clarification regarding the burden of proof. When read in context, Simons was not referring to the burdens of proof.

¶ 63                                B. Excusing Jurors for Cause

¶ 64        Plaintiff contends the trial court erred by not removing potential jurors Schlesinger, Rich, Knoth, Isaacs, and Bless for cause. Plaintiff maintains these jurors' answers to questions demonstrate they could not be fair and impartial.

¶ 65        In response, defendants cite this court's decision in *Grady v. Marchini*, 375 Ill. App. 3d 174, 179, 874 N.E.2d 179, 184 (2007), as establishing plaintiff waived her challenge to the prospective jurors. Defendants emphasize none of the jurors involved in the challenged rulings heard the case and plaintiff has identified no objectionable juror who did.

¶ 66        In her reply brief, plaintiff provides no authority-based argument in response to defendants' reliance on *Grady*. Plaintiff simply contends when a party is forced to use

peremptory challenges on jurors that should have been excused for cause that party is deprived the opportunity to use peremptory challenges on other jurors and the purpose of *voir dire* is thwarted.

¶ 67        During *voir dire* proceedings, plaintiff exercised her eight peremptory challenges. Before she did so, plaintiff asked the trial court to dismiss for cause potential jurors Schlesinger, Rich, Knoth, and Bless. After the trial court denied her requests, plaintiff used her challenges. The realtor defendants used a peremptory challenge to excuse Isaacs.

¶ 68        "[A] trial court's ruling on a challenge for cause will only be reviewed when *an objectionable juror* was forced upon the party after it had exhausted its peremptory challenges." *Flynn v. Edmonds*, 236 Ill. App. 3d 770, 779, 602 N.E.2d 880, 885 (1992) (citing *Spies v. People*, 122 Ill. 1, 12 N.E. 865 (1887)); see also *Grady*, 375 Ill. App. 3d at 179. The *Spies* decision, cited in *Flynn*, shows a court will review a ruling on the competency of jurors only when the challenged ruling relates to a juror "who *tried* the case." *Spies*, 122 Ill. at 257-58 (Emphasis in original and internal quotation marks omitted.). Plaintiff has not identified any juror, other than Isaacs, she was forced to accept. Isaacs, however, was excluded by the realtor defendants and thus did not sit on the jury. No ruling challenged by plaintiff applies to any juror who tried the case. Plaintiff cannot acquire a new trial on this ground.

¶ 69        We note plaintiff's cases are unconvincing. In *People v. King*, 54 Ill. 2d 291, 297-98, 296 N.E.2d 731, 735 (1973), the issue was whether the trial court erred in excusing a juror on the juror's bare assertion he could not be fair and impartial due to defendant's race, a race that he was prejudiced toward. *King* does not establish we should consider plaintiff's arguments when the challenged rulings did not involve a juror who tried the case. In *Clark v.*

*Mattar*, 133 N.E.3d 220, 224-25 (Ind. Ct. App. 2019), a nonbinding case from another state, the plaintiff asserted the trial court committed error by not striking a juror for cause, resulting in the plaintiff having to accept "the objectionable Juror #3." The Indiana appellate court concluded the juror should have been stricken for cause. *Id.* at 225. We will not follow *Clark* for multiple reasons. First, it is factually distinguishable as plaintiff in this case has not asserted an "objectionable juror" decided her case as a result of the trial court's alleged error in not excusing the jurors she challenged. Second, the *Clark* court found error without analyzing whether "the objectionable Juror #3" in its case was unfair or impartial. *Id.* Third, the *Clark* decision has been transferred to the Indiana Supreme Court (see *Clark v. Mattar*, No. 19A-CT-380, 143 N.E.3d 961 (table) (Ind., Mar. 12, 2020)) meaning the appellate court opinion has been vacated (see Ind. R. App. P. 58(A) (eff. Jan. 1, 2016)).

¶ 70                    C. Testimony of Termite Damage by Leininger and Smith

¶ 71            Plaintiff contends the trial court erred by not allowing testimony of the termite inspectors, William Leininger and Phil Smith. As to Leininger, plaintiff contends when the trial court ruled Leininger could not testify about his inspection and the termite damage, plaintiff's ability to prove constructive notice was taken from her. According to plaintiff, Leininger would have testified to evidence of prior termite treatment, from which knowledge could be imputed to Moore. Plaintiff further argues Smith should have been able to testify to the "total deterioration of the landing and all supports as a result of the excessive moisture and termite damage." Plaintiff concludes her disclosures under Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007) sufficiently apprised defendants of the subject matter of their testimony and the trial court's refusal to allow the two to testify hindered her ability to prove constructive notice of the

damaged floor.

¶ 72     Defendants contend plaintiff waived any challenge to Leininger, as plaintiff agreed Leininger would not testify at trial. Defendants further contend both witnesses were properly excluded as neither were disclosed to give expert opinion testimony.

¶ 73                    1. *Plaintiff's Rule 213 Disclosures*

¶ 74     In April 2017, plaintiff filed her Rule 213(f) (Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2007)) witness disclosures. In the first part of the disclosures, plaintiff identified multiple witnesses as Rule 213(f)(1) witnesses who may give fact or lay-opinion testimony at trial. Plaintiff listed William Leininger and Phil Smith as individuals "expected to testify to the condition of the floor prior to [plaintiff's] fall on October 1, 2011 ***." In the fourth part of the disclosures, plaintiff stated the following: "The opinions set forth in the medical records, answers to interrogatories, documents submitted in response to a request for production, and depositions of all witnesses disclosed herein or by any party to this litigation are adopted by reference as part of this disclosure."

¶ 75     2. *Motions* In Limine *Involving Leininger, Smith, and Termite Damage*

¶ 76     At the request of David and Rachel, who were under contract to purchase the Barnett House, William Leininger inspected the home. After his inspection, Leininger completed a "Wood Destroying Insect Inspection Report." According to the report, Leininger found "termite damage east side entrance under where floor gave way." He also concluded "[i]t appears that the structure(s) or a portion thereof may have been previously treated." He indicated he did not know the extent of the treatment or "what the treatment consisted of." Leininger recommended treatment for termites.

- 23 -

¶ 77        Phil Smith inspected the Barnett House after the floor collapsed. By letter dated

October 12, 2011, Smith stated he inspected the premises to assess damage on the landing and

adjoining staircases. Smith found "[t]otal deterioration of the landing and all supports as a result

of the excessive moisture and termite damage" and "[b]oth adjoining staircases-main stringers,

treads, risers and all structural supports are rotted from both excessive moisture and termite

damage."

¶ 78                    a. Moore's First Motion *In Limine*

¶ 79        Moore filed her first motion *in limine* in January 2018, seeking to bar the

testimony of Leininger "as a lay opinion witness." Moore argued plaintiff's disclosure indicated

Leininger would testify only about the floor's condition before the fall, but Leininger's report

was limited to his observations of the post-occurrence condition. Moore also argued there was no

suggestion in the disclosure Leininger would use his observations to express an opinion as to the

condition of the floor before October 1, 2011.

¶ 80        At the hearing on the motion, plaintiff argued she had an objection to the blanket

statement that evidence of termite inspection after the incident was barred. Counsel stated,

however, "I don't have an objection as far as Mr. Leininger being barred from expressing any

opinion." More than once, plaintiff's counsel indicated she had no objection to barring Leininger

from testifying:

>        "THE COURT: You don't have any objection to Mr.
>
>    Leininger being barred from testifying?
>
>        [PLAINTIFF'S COUNSEL]: I think basically what is
>
>    summed up in Mr. Walsh's final paragraph that Defendant

Moore's asking for, the motion to be granted and evidence of a termite inspection performed by Mr. Leininger, be barred and that he be also barred from expressing any opinions regarding the condition of the floor, I have no objection to that.

THE COURT: But there is something that you are concerned about?

[PLAINTIFF'S COUNSEL]: I don't know for sure. I don't know. We did—and we'll be talking more about it, but we did have the evidence deposition of Ms. Moore on just this past Monday. There [were] some questions and discussion about work that was done at the house, which I think is why Mr. Walsh withdrew that motion barring the subsequent remedial repairs. I don't know. I just don't want to be precluded that, if that door has been opened with Ms. Moore's testimony, that I cannot ask further about it if it comes up. I just don't want to be precluded.

As it pertains specifically to Mr. Leininger, I have no objection. I don't anticipate calling him to express any of those opinions."

\* \* \*

THE COURT: Is there an objection to this motion *in limine*?

[PLAINTIFF'S COUNSEL]: There's not. As I said, I have

no intention of calling Mr. Leininger to address those."

¶ 81        According to the written order, plaintiff was barred "from presenting evidence, or from commenting thereon, during any part of the trial, including *voir dire*, of a termite inspection performed by William Leininger on October 5, 2011." The court further barred William Leininger "from expressing any opinions regarding the condition of the floor prior to the occurrence."

¶ 82                         b. Moore's Fourth Motion *In Limine*

¶ 83        In July 2018, Moore filed her "Fourth Motion *in Limine*," seeking to bar plaintiff from presenting "evidence at trial that the floor collapsed due to damage from termites, other wood[-]boring insects or any other cause." Moore alleged she did not dispute the floor collapsed after plaintiff stepped onto it and, thus, the cause of the collapse was not relevant to any issue. Moore further alleged plaintiff failed to disclose a witness who would offer testimony as to the cause of the collapse. Moore argued plaintiff should not be allowed to present evidence as to the *cause* of the collapse but allowed to testify regarding the *condition* of the floor. Moore maintained plaintiff would still be able to argue evidence of constructive notice.

¶ 84        In response, plaintiff maintained she "fell through an obviously rotten floor." Plaintiff argued her burden of proof was to present evidence defendant knew or should have known of the dangerous condition before plaintiff's injury. Plaintiff stated Moore's testimony regarding previous termite treatment was evidence of her actual and constructive knowledge of the condition of the floor.

¶ 85        The trial court agreed with defendant and held the following: "Plaintiff is barred from presenting evidence, or from commenting thereon, during any part of the trial, including

- 26 -

*voir dire*, that the floor collapsed due to damage from termites, other wood[-]boring insects or any other cause."

¶ 86                                c. Moore's Twelfth Motion *In Limine*

¶ 87        After plaintiff filed a subpoena for Smith to appear at trial, Moore filed her twelfth motion *in limine*, seeking to bar Smith from testifying regarding his "post occurrence inspection" and providing opinions based on that inspection. Moore argued plaintiff did not disclose Smith as an opinion witness in her disclosures and did not supplement the witness disclosure at any time. Moore maintained plaintiff disclosed only that Smith would testify about the condition of the floor before the occurrence and did not disclose he would be offering opinion testimony or testify regarding post-occurrence observations.

¶ 88        At the hearing on the motion, the issue was contested:

"THE COURT: Well, that motion *in limine* asks that Phil Smith be barred from testifying about his post-accident inspection of premises and bar him from testifying to any opinions based upon his post-accident inspection.

It sounds to me that there's not an objection to that motion because he's going to testify about what he saw prior to the incident.

[PLAINTIFF'S COUNSEL]: That's correct.

[MOORE'S COUNSEL]: But, Your Honor, too, just based on what [plaintiff's counsel] said—I don't want to get into he indicated what he saw and what he thought. Okay. So that is an

- 27 -

opinion.

[PLAINTIFF'S COUNSEL]: Which I e-mailed to him several months ago.

THE COURT: The opinion?

[PLAINTIFF'S COUNSEL]: Yeah. It's in the e-mail.

THE COURT: What's the nature of the opinion?

[PLAINTIFF'S COUNSEL]: That he saw the floor and that it was rotten, which is within the purview of the common man to begin with.

He didn't see the floor because we know the ruling, but he saw the stringers leading up to the landing on the stairs and the stairs themselves.

THE COURT: Why wouldn't he be able to testify that he was there before the incident, he looked at the stringers, they appeared to be rotten or the thing leading to the floor appeared to be rotten?

[MOORE'S COUNSEL]: Because in the opinion witness disclosure of the plaintiff, which the parties are entitled to rely upon, there was never a disclosure to that effect. That's where you tell the other side who your opinions [sic] and what they are going to be and what they are going to say and what they are based on, and the rule is very specific as to the information that has to be

provided.

That was never provided. I'm entitled to rely on that disclosure. I've been getting information from [plaintiff's counsel] *** throughout the course of this trial. But if you don't tell me that that is what your witnesses are going to say pursuant to this rule, I—you know, that's what is required, and the rule requires strict disclosure. I don't have a very good memory on things. I don't recall the letter. If [plaintiff's counsel] has the letter, fine. Okay. But I don't recall the letter. It's already been addressed that we cannot go into cause of the collapse and anything related to that, any suggestion that there was a cause for the collapse. We have a judicial admission that the condition of the floor underneath was not apparent. You cannot controvert that. And that is what I see is attempting to be done here, is an end round around the judicial admission."

¶ 89 The trial court ruled it "would grant the motion as far as opinions are concerned." The court stated Smith could testify as to what he saw and how it appeared. Smith was "not going to say it looked like it was going to collapse the next time somebody stepped foot on it, in my opinion, or something like that." In response, plaintiff's counsel replied, "No, he's not going to say that, I don't think."

¶ 90 The May 20, 2019, written order provides the following: "Defendant's Twelfth Motion in Limine is allowed. Plaintiff's witness, Phil Smith, is barred from testifying to his

post-accident inspection of the premises and from testifying to any opinions based upon his post-accident inspection."

¶ 91                   3. *Propriety of the Order Barring Leininger's Testimony*

¶ 92          Defendants assert plaintiff waived review of the order barring Leininger's testimony. We agree. Fundamental to our adversarial process is the proposition a party waives the right to complain of error when to do so is inconsistent with the party's position in a prior court proceeding. *McMath v. Katholi*, 191 Ill. 2d 251, 255, 730 N.E.2d 1, 3 (2000). "A party cannot complain of error which he induced the court to make or to which he consented." *Id.* Here, plaintiff consented to the trial court's order barring Leininger's opinion testimony: "As it pertains specifically to Mr. Leininger, I have no objection. I don't anticipate calling him to express any of those opinions." We note, in her reply brief, plaintiff had no response to defendant's argument plaintiff waived any challenge to the exclusion of Leininger's testimony. This argument is waived.

¶ 93                   4. *Propriety of the Order Limiting Smith's Testimony*

¶ 94          Defendants contend plaintiff waived consideration of the arguments regarding Phil Smith, because, in part, plaintiff did not raise the issue in her posttrial motion. In her reply brief, plaintiff asserts only that her "argument regarding Phil Smith is encompassed within her Post-Trial Motion at paragraph 2 in the discussion about termite damage."

¶ 95          "A party may not urge as error on review of the ruling on the party's post-trial motion any point, ground, or relief not specified in the motion." Ill. S. Ct. R. 366(b)(2)(iii) (eff. Feb. 1, 1994). In civil jury cases, a posttrial motion "must contain the points relied upon, particularly specifying the grounds in support thereof, and must state the relief desired ***." 735

ILCS 5/1202 (West 2016). Our supreme court has stated, "The purpose of the post-trial motion specificity rule is threefold." *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344, 349, 415 N.E.2d 337, 339 (1980). The first is the rule allows the decisionmaker most familiar with the trial events, the trial judge, to review his or her decision without the pressure of an ongoing trial and to award a new trial if he or she concludes the earlier decision was incorrect. *Id.* The second is the rule allows a court of review to determine from the record whether the trial court was afforded an adequate opportunity to reassess the challenged ruling. *Id.* And, last, "by requiring the litigants to state the specific grounds in support of their contentions, it prevents them from stating mere general objections and subsequently raising on appeal arguments which the trial judge was never given an opportunity to consider." *Id.* at 349-50; see also *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 353, 603 N.E.2d 449, 454 (1992) (declining to address the appellant's claim as "the defendant failed completely to articulate its position in its post-trial motion").

¶ 96        Paragraph 2 of her posttrial motion states the trial court committed error in the following:

> "Granting Defendant Moore's Fourth Motion *in Limine* barring Plaintiff from presenting evidence that the floor collapsed due to damage from termites on September 10, 2018. Plaintiff had evidence of termite damage. Spraying for termites did not cure the dangerous conditions of the wood. If wood is rotten, it will still be rotten after it is sprayed for termites. Mr. Leininger should have been allowed to testify to the presence of termites at or near the

- 31 -

time of the collapse. Even if it were a subsequent remedial measure, such evidence may be admissible for other purposes."

¶ 97    Plainly, paragraph 2 does not refer to Phil Smith or the trial court's decision to grant Moore's twelfth motion *in limine*. The question becomes whether the posttrial motion that refers to "evidence of termite damage" and refers specifically to Leininger and the fourth motion *in limine* encompasses the claim on appeal Smith's testimony was improperly excluded as the disclosure was proper. It does not.

¶ 98    Regarding Smith's testimony, plaintiff's appellant argument is the trial court erred in limiting his testimony by granting Moore's twelfth motion *in limine*. Plaintiff contends it was granted because plaintiff did not disclose Smith as an individual who would provide an opinion as to the cause of the collapse of the floor.

¶ 99    Yet the posttrial motion does not mention Smith's testimony or the granting of the twelfth motion *in limine*. The posttrial motion also does not assert, as a ground for relief, the same ground for relief asserted on appeal. In the posttrial motion, the ground for relief was the evidence of termites was relevant. However, on appeal, the ground for relief is the disclosure related to Smith was proper. The first paragraph of the posttrial motion refers to Leininger and the first motion *in limine*. Paragraph 2 again mentions Leininger. Plaintiff did not raise Smith's testimony in her posttrial motion. It is forfeited.

¶ 100    D. Testimony of Plaintiff's Post-Concussive Syndrome

¶ 101    In May 2019, Moore filed her ninth motion *in limine*, seeking to bar plaintiff's treating neurologist, Dr. Rana Mahmood, from testifying he diagnosed plaintiff with post-concussive syndrome as a result of the accident. The basis for the motion was the alleged

failure of plaintiff to comply with the disclosure requirements of Rule 213 (Ill. S. Ct. R. 231(f)(2) (eff. Jan. 1, 2007)). The trial court granted the motion.

¶ 102    On appeal, plaintiff argues the trial court should not have barred Dr. Mahmood from testifying regarding his diagnosis of plaintiff as suffering post-concussive syndrome as a result of the fall. Defendants respond by first arguing this issue involves damages and, because the jury found for defendants on the issue of liability, the damages issue is moot. We agree.

¶ 103    In general, trial errors relating only to damages will not be considered on appeal when it is evident the jury, having found in the defendant's favor as to liability, did not reach the question of damages. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 531, 736 N.E.2d 1074, 1089 (2000). An exception exists when the errors that go to the question of damages are " 'so pervasive and prejudicial as to create the likelihood that they may have affected a jury's decision on the issue of liability.' " *Id.* (quoting *Mulvey v. Illinois Bell Telephone Co.*, 53 Ill. 2d 591, 599-600, 294 N.E.2d 689, 694 (1973)).

¶ 104    Dr. Mahmood's excluded testimony only goes to the injuries plaintiff suffered and the cause of those injuries—matters relevant only to the question of damages. The jury found in defendants' favor as to liability and thus did not reach the questions of damages. We need not consider whether the trial court erred in barring Dr. Mahmood's testimony on the diagnosis of post-concussive syndrome.

¶ 105    E. Rebuttal Testimony by Michael Thrasher

¶ 106    In June 2018, plaintiff filed her amended statement of the case and witness list. On the list of 23 individuals was Michael Thrasher. No information was provided regarding the substance of the testimony.

- 33 -

¶ 107        The realtor defendants filed a motion *in limine* to bar testimony by "a number of names that [they] had not seen beforehand," including Thrasher. The realtor defendants maintained the opinions of the named witnesses were not disclosed to the defendants and the disclosure of a name and a copy of Thrasher's fireplace inspection report did not comply with the disclosure requirements in Rule 213(f).

¶ 108        At the May 2019 hearing on motions *in limine*, plaintiff asserted the names of the individuals had been raised in depositions and should not be considered a surprise. The following was said regarding Thrasher:

> "But here's the thing: I mean we have the ability to call rebuttal witnesses and we don't know what at this point the defendants' testimony exactly is going to be, or certainly we don't I mean with respect to Shirley Moore. We've got a pretty good idea.

                                        * * *

> And the Thrasher guy, you know, is a witness who was disclosed. Basically, he could potentially show the jury and the court that maybe some of the information that was put onto that disclosure by Ms. Moore was, in fact, not true. And I think that I should be able to impeach her credibility."

In response to more argument by the realtor defendants, plaintiff stated further: "Specifically Thrasher. I mean we have a folder in our electronic filing system called documents received from the Brady defendants, and this guy's inspection report is produced back to us by Brady saying,

you know, inspections received."

¶ 109    Most likely referring to Thrasher, plaintiff further stated, "Well, the guy came—and so Shirley Moore writes on the disclosure this fireplace is safe and been used. And this guy comes and looks at it and he says nothing has been used in a long time and it's not safe." The realtor defendants responded that was an undisclosed opinion.

¶ 110    The trial court, apparently examining the May 2019 potential witness list, stated: "I don't know who these witnesses are or what they might be testifying." The court granted the motion: "If they were not disclosed as witnesses, those people will be barred from testifying."

¶ 111    In general, evidentiary motions, including motions *in limine*, are matters within the trial court's discretion. *Enbridge Pipeline v. Hoke*, 2017 IL App (4th) 150544, ¶ 97, 80 N.E.3d 807. So too are decisions on whether an opinion has been adequately disclosed so that it may be admitted into evidence. *Id.* ¶ 105. A ruling of the trial court on such matters will not be disturbed on review absent an abuse of that discretion. *Id.* ¶ 97. This is a high standard: an abuse of discretion will not be found for an evidentiary ruling unless it could be said no reasonable person would take the view of the trial court. *In re Leona W.*, 228 Ill. 2d 439, 460, 888 N.E.2d 72, 83 (2008).

¶ 112    In barring Thrasher's testimony, the trial court plainly found plaintiff failed to comply with Rule 213(f)'s disclosure requirements. The court thus found plaintiff's witness list, provided with no explanation regarding the substance of the testimony, and provision of Thrasher's inspection report were insufficient to satisfy Rule 213. Plaintiff, however, made no effort to show, with citation to relevant authority, the court's decision was an abuse of discretion. The only case law in this part of plaintiff's brief is to show rebuttal evidence is admissible and to

argue the offer of proof requirement was satisfied in this case to preserve the issue on appeal. This case law does not establish plaintiff's witness list, with no description of Thrasher's anticipated testimony, and plaintiff's production of Thrasher's inspection report complied with Rule 213. " 'A court of review is entitled to have the issues clearly defined and to be cited pertinent authority.' " *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 493, 771 N.E.2d 357, 364 (2002) (quoting *Canteen Corp. v. Department of Revenue*, 123 Ill. 2d 95, 111-12, 525 N.E.2d 73, 80 (1988)). A point not supported by citation to relevant authority fails to satisfy the briefing requirements of Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018). The argument is forfeited.

¶ 113                                      F. Judicial Admission

¶ 114          Plaintiff argues the trial court erred in deeming a statement she made in her "Response to Defendant Shirley Moore's Motion to Deem Statement by Plaintiff as a Judicial Admission" to be a judicial admission rather than an evidentiary admission. In that response, plaintiff wrote the following, which the court found to be a judicial admission: "[The condition of the wood] was not visible because it was covered by ceramic tile and its condition was not apparent until after the floor collapsed!"

¶ 115          1. *Hearing on the Motions to Deem Statements as Judicial Admissions*

¶ 116          In January 2019, Moore filed a motion to deem a statement by plaintiff as a judicial admission. Moore cited plaintiff's response to her fourth and fifth motions *in limine*, in which plaintiff stated "[t]his is a case in which [plaintiff], a realtor, fell through an obviously rotten floor at a home owned by [Moore.]" Moore argued the trial court should deem the admission of fact that it was obvious the floor was rotten when plaintiff fell through it.

- 36 -

¶ 117        In response to the motion, plaintiff argued the context of the statement was

important. Plaintiff reminded the court Moore was seeking, in its fourth and fifth motions

*in limine* to bar plaintiff from introducing Moore's testimony the floor had been treated for

termites before it collapsed. Plaintiff reminded the court it had viewed the wood from the

subfloor and saw that it was rotten. Plaintiff argued Moore's goal of having the court recognize

the floor was "an open and obvious danger" is "based on a logical fallacy." Plaintiff emphasized

the floor was covered with ceramic tile: "The condition of the wood under the ceramic tile could

not have been open and obvious to Plaintiff unless it was visible. It was not visible because it

was covered by ceramic tile and its condition was not apparent until after the floor collapsed!"

¶ 118        Before a hearing on the motion was held, counsel for Brady Realtors and

Schneider, in February 2019, filed a motion seeking a judicial admission based on plaintiff's

statement: "The condition of the wood under the ceramic tile *** was not visible because it was

covered by ceramic tile and its condition was not apparent until after the floor collapsed!"

¶ 119        In March 2019, the trial court held a hearing on the motions. As to Moore's

motion, the court agreed with plaintiff and denied the motion. The court believed plaintiff's

"obviously rotten" statement applied to the condition of the wood as known after the collapse.

¶ 120        The trial court then addressed the motion of Brady Realtors and Schneider.

Counsel for the realtor defendants argued plaintiff's statement, "it could not have been visible

because it was covered by ceramic tile, and its condition was not apparent until after the floor

collapsed," was an admission in regard to the duty of his clients. After counsel for both

defendants argued the court should take plaintiff's statement as a judicial admission as it was

relevant to the alleged realtor defendants' duty to plaintiff, the following discussion occurred

between plaintiff's counsel and the trial court:

"THE COURT: All right. [Plaintiff's counsel], I'll hear your argument. I am curious as to what extent you –

First of all, my question is: Are you arguing that there's going to be evidence presented contrary to the fact that there was ceramic tile covering the wood subfloor? Because that seems to me not to be an issue. Maybe it is. Maybe it isn't. I don't think that it is.

***

[PLAINTIFF'S COUNSEL]: I think that goes back to the whole inference argument when we were talking about admissions.

And, you know, I would just like to point out that, you know, I was citing Shirley Moore's testimony that it was covered by tile.

I'm a little befuddled as well because they filed motions that are in direct contravention of one another. At the end of the day, Brady Realty is the agent of Moore when she is selling this home, so there is an element of vicarious liability there. So to the extent that the jury finds that [Schneider] and [Brady Realtors] did anything wrong, I think [Moore] has got to pay for it anyway. So, you know, that's why I just think that instead of nitpicking each other's briefs, why don't we just get to the heart of the matter when

we are in trial? You know, if they want to make motions and have sidebars during the trial, we can argue it then.

* * *

THE COURT: This particular statement, I think I could easily find and probably will that it's a judicial admission that the floor, where this occurred, the wood subfloor was covered by ceramic tile and not apparent until after the floor collapsed.

I am going to grant the motion that it is a judicial admission to the fact that it's not apparent, which means, by looking at it, you can't see the condition of the wood subfloor and you are not aware of it until after the floor collapsed.

* * *

And I think, as I recall, at least some of the evidence the plaintiff intends to present is that there were warnings or some statements made about the condition of the floor, and the argument is going to be, well, does that mean—obviously, the homeowner may have some duty, may or may not have some duty beyond what was done ***."

¶ 121    The trial court entered the following written order: "IT IS HEREBY ORDERED that the following statement by Plaintiff by and through her attorney is deemed a judicial admission: That the condition of the wood under the ceramic tile was not visible. It was not visible because it was covered by ceramic tile and its condition was not apparent until the floor

collapsed."

¶ 122                              2. *Applicable Law and Appellate Argument*

¶ 123              There are two types of admissions, judicial and evidentiary. *Brummet v. Farel*,

217 Ill. App. 3d 264, 267, 576 N.E.2d 1232, 1234 (1991). "Judicial admissions are defined as

deliberate, clear, unequivocal statements by a party about a concrete fact within that party's

knowledge." (Internal quotation marks omitted.) *In re Marriage of Hundley*, 2019 IL App (4th)

180380, ¶ 118, 125 N.E.3d 509. This court has also stated the concrete fact must be "uniquely

within the party's personal knowledge." *Williams Nationalease, Ltd. v. Motter*, 271 Ill. App. 3d

594, 599, 648 N.E.2d 614, 617 (1995). Judicial admissions withdraw a fact at issue and cannot

be contradicted at trial. *Hundley*, 2019 IL App (4th) 180380, ¶ 118. They cannot be matters of

opinion, estimate, inferences, appearance, or uncertain summary. *Id.* Judicial admissions include

admissions made in pleadings, formal admissions made in open court, stipulations, and

admissions pursuant to requests to admit. *Brummet*, 217 Ill. App. 3d at 267 (quoting M. Graham,

Evidence Text, Rules, Illustrations and Problems at 146 (1983)). In contrast, evidentiary

admissions "may be controverted or explained by the party." *Id.* Such "admissions may be made

in, among other things, pleadings in a case other than the one being tried, pleadings that have

been superseded or withdrawn, [and] answers to interrogatories ***." *Id.* (citing Graham at 146).

In the next sentence, however, the court observed answers to interrogatories may be treated as

judicial admissions. *Id.* When deciding whether a statement is a judicial admission, the court

must consider the circumstances of the case and give meaning to the statement consistent with

the context in which it was found. *Motter*, 271 Ill. App. 3d at 599. The court must also consider

the statement in relation to the other testimony and evidence presented. *Smith v. Pavlovich*, 394

- 40 -

Ill. App. 3d 458, 468, 914 N.E.2d 1258, 1268 (2009).

¶ 124　　　　The parties argue different standards of review to apply to the trial court's determination the statement was a judicial admission. Defendants contend the applicable standard of review is the abuse of discretion standard. For this proposition, they cite *Dremco, Inc. v. Hartz Construction Co.*, 261 Ill. App. 3d 531, 536, 633 N.E.2d 884, 888 (1994). According to *Dremco*, "[a]n abuse of discretion standard applies when reviewing a circuit court's treatment of judicial admissions." *Id.* This court has held the same: "A trial court's treatment of a judicial admission is reviewed for an abuse of discretion ***." *Hundley*, 2019 IL App (4th) 180380, ¶ 118.

¶ 125　　　　Plaintiff contends, however, the standard of review is *de novo*. In support, plaintiff relies on language from this court's decision in *Herman v. Power Maintenance & Constructors, LLC*, 388 Ill. App. 3d 352, 360, 903 N.E.2d 852, 859 (2009): "Whether an admission is a judicial admission or an evidentiary admission is a question of law, which we decide *de novo*." See also *Armstead v. National Freight, Inc.*, 2019 IL App (3d) 170777, ¶ 13 ("Whether plaintiff's signed response in the Agreement is a judicial admission is a question of law we review *de novo*.").

¶ 126　　　　While the parties assert differing standards of review, no party attempts to explain why the other standard should not be applied. Based on the plain language alone, it seems the abuse of discretion standard applies to the *treatment* of the judicial admission, such as how it is used during trial, whereas the *de novo* standard applies when determining whether a statement is a judicial admission. However, at least one appellate court has applied the abuse of discretion standard to determine whether a statement was properly found to be a judicial admission. See

- 41 -

*Lowe v. Kang*, 167 Ill. App. 3d 772, 777, 521 N.E.2d 1245, 1248 (1988) ("The next issue is whether the trial court abused its discretion in finding defense counsel's statements in closing arguments to be a judicial admission of defendant's liability.").

¶ 127    Ultimately, we need not decide which standard applies as, even if the trial court erred in deeming the statement a judicial admission, plaintiff suffered no prejudice as a result of its admission.

¶ 128    A motion for a new trial should not be granted unless "(1) the verdict is against the manifest weight of the evidence or (2) a trial error or an accumulation of trial errors prejudiced the movant or unduly affected the outcome of the trial." *Hall v. Cipolla*, 2018 IL App (4th) 170664, ¶ 131, 127 N.E.3d 620. Plaintiff asserts she was prejudiced because the judicial admission allowed defendants to circumvent the discovery deadline and use an argument to establish a fact. In addition, the judicial admission allowed defense counsel to tell the jury plaintiff's counsel conceded this standard during opening statements:

> "The condition of the wood under the ceramic tile was not visible.
> It was not visible. It was not visible because it was covered by
> ceramic tile, and its condition is not apparent until after the floor
> collapsed. Nobody knew about it. Nobody knew about this
> condition. The plaintiff has admitted this. The document filed in
> this court in this case, this cannot be contradicted. It cannot be
> denied. It cannot be explained. And, yet, they want to hold Shirley
> Moore to a standard that they themselves have admitted does not
> exist."

- 42 -

¶ 129    We are not convinced. The statement was not a judicial admission that barred plaintiff from arguing about Moore's duty to individuals in her home or presenting evidence of actual or constructive notice of a problem with the floor by Moore. In the order finding the statement to be a judicial admission, the court was clear the admission was to show "by looking at it, you can't see the condition of the subfloor and you are not aware of it until after the floor collapsed" and "some of the evidence the plaintiff intends to present is that there were warnings or some statements made about the condition of the floor and the argument is going to be *** the homeowner may have some duty *** beyond what was done." The fact that "by looking at it, you can't see the condition of the subfloor" entered evidence by not only the judicial admission but also by testimony from at least three of plaintiff's witnesses. David Torbert testified he could not see underneath the tile. Tool and Fuiten did the same.

¶ 130    In addition, the admission did not prevent plaintiff from presenting evidence of constructive notice or arguing it to the jury. The evidence at trial showed Moore lived in a house that was approximately 90 years old. She lived there for two years and visited weekly for approximately four years before the collapse. During the time she owned the house, Moore walked over the landing "millions of times." The landing's floor, according to testimony, was "soft" and "cracked." The stairs and stringers underneath the landing and attached to the landing were damp and a screwdriver poked through the wood. Moore admitted treating the house for termites. That the subflooring could not be seen under tile is obvious. Plaintiff's ability to prove constructive notice was not hindered.

¶ 131                             III. CONCLUSION

¶ 132    We affirm the trial court's judgment.

¶ 133        Affirmed.